**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| | : |
| **SECURITIES AND EXCHANGE COMMISSION,** | : |
| | : |
| *Plaintiff*, | : |
| | : |
| v. | : |
| | : |
| **JOHN A. MATTERA, et al.,** | : **11 Civ. 8323 (PKC)** |
| | : **ECF CASE** |
| *Defendants*, | : |
| | : |
| - AND - | : |
| | : |
| **ANN A. MATTERA, et al.,** | : |
| | : |
| *Relief Defendants*. | : |
| | : |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS EMERGENCY**
**EX PARTE APPLICATION FOR AN ORDER TO SHOW CAUSE WHY**
**DEFENDANT JOHN A. MATTERA AND RELIEF DEFENDANT ANN A. MATTERA**
**SHOULD NOT BE HELD IN CIVIL CONTEMPT OF COURT**
**FOR VIOLATING THE ASSET FREEZE AND DISCLOSURE PROVISIONS**
**OF THIS COURT'S ORDERS**

SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Room 400
New York, New York 10281
(212) 336-0140 (Willenken)
E-mail: WillenkenK@sec.gov

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ...........................................................................................1

FACTUAL BACKGROUND................................................................................................2

    A.  The TRO and Orders ..............................................................................................2

    B.  Mrs. Mattera Leased a New Audi Automobile and Luxury
        Condominium In Violation of the Asset Freeze Provision of the PI Order .........................7

    C.  Defendants Converted Frozen Personal Assets into Cash to Fund Secret Accounts ............8

    D.  Defendants Used the Secret Accounts and Other Undisclosed Assets to
        Continue Their Luxurious Lifestyle in Violation of the Asset Freeze Orders .....................9

    E.  Mrs. Mattera Is in Violation of This Court's Orders to Disclose Her Assets .....................13

LEGAL ARGUMENT.........................................................................................................14

    A.  The SEC Has Satisfied the Prerequisites For A Finding of Civil Contempt.......................14

    B.  The Relief Requested for the Contemptuous Conduct of the Defendants .........................17

CONCLUSION....................................................................................................................20

## TABLE OF AUTHORITIES

**Page**

**Cases**

*EEOC v. Local 28*, 247 F.3d 333, 336 (2d Cir. 2001) ...................................................17

*EEOC v. Local 638*, 753 F.2d 1172, 1178 (2d Cir. 1985) .......................................15, 16

*Leser v. U.S. Bank Nat'l Ass'n*, No. 09 Civ. 2362, 2011 WL 1004708, at *10
    (E.D.N.Y. Mar. 18, 2011).........................................................................................17

*N.A. Sales Co. v. Chapman Indus. Corp.*, 736 F.2d 854, 857 (2d Cir. 1984)................17

*N.Y. State Nat'l Org. for Women v. Terry*, 952 F. Supp. 1033, 1044 (S.D.N.Y. 1997),
    *aff'd*, 159 F.3d 86 (2d Cir. 1998) .............................................................................17

*NBA v. Design Mgmt. Consultants, Inc.*, 289 F. Supp. 2d 373, 377 (S.D.N.Y.2003) ....................15

*Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Tech., Inc.*,
    369 F.3d 645, 657 (2d Cir. 2004) ..............................................................................17

*SEC v. Bremont*, No. 96 Civ. 8771, 2003 WL 21398932, at *7 (S.D.N.Y. June 18,
    2003).............................................................................................................................17

*SEC v. Levine*, 671 F. Supp. 2d 14, 26 (D.D.C. 2009) ............................................14, 15

*SEC v. Pittsford Capital Income Partners, LLC*, No. 06 Civ. 6353, 2010 WL 2025500,
    at *2 (W.D.N.Y. May 20, 2010).................................................................................14

*SEC v. Universal Express, Inc.*, 546 F. Supp. 2d 132, 134 (S.D.N.Y. 2008) ...............15

*Shillitani v. U.S.*, 384 U.S. 364, 370 (1966) .................................................................14

*Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir. 1996)......................................................17

**Statutes**

18 U.S.C. § 401............................................................................................................ 14

The Securities and Exchange Commission ("SEC") respectfully submits this memorandum of law in support of its emergency ex parte application for an order to show cause why Defendant John A. Mattera ("Mattera") and Relief Defendant Ann A. Mattera ("Mrs. Mattera") (collectively, "Defendants") should not be held in civil contempt of court for their repeated and flagrant violations of this Court's orders of November 17, 2011, November 29, 2011 and December 1, 2011. Both Defendants have violated the asset freeze established by this Court's orders dated November 29, 2011 (the "Consent Order") and December 1, 2011 (the "PI Order," and together with the Consent Order, the "Orders"), and Mrs. Mattera has violated the disclosure provisions of the PI Order and the temporary restraining order dated November 17, 2011 (the "TRO").

## PRELIMINARY STATEMENT

Since the entry of the Orders, which froze both Defendants' assets, Defendants have spent more than $100,000 for a variety of purposes, including to maintain Mattera's luxurious lifestyle. For example, Mrs. Mattera leased an expensive condominium apartment, in which Mattera currently resides. She also used frozen funds to upgrade her automobiles (one of which is presumably used by Mattera), exchanging a 2004 Audi and 2010 Toyota Corolla for a 2009 Audi and leasing a brand new 2012 Audi automobile. In an apparent effort to hide these activities from the SEC, Mrs. Mattera created two new bank accounts, made large cash deposits to these accounts, and paid most of the expenses from them. Mattera apparently had $28,000 of his frozen assets converted to a cashier's check, payable to himself, which was deposited in one of the new accounts opened by Mrs. Mattera.

In addition, Mrs. Mattera has refused to comply with her obligations under the PI Order and TRO to provide an accounting and to respond to document requests from the SEC. On April

2, 2012, the staff sent Mrs. Mattera a letter in which it reminded her of her obligations under the PI Order and requested that she provide an accounting and her response to the SEC's document requests no later than April 9, 2012.  The SEC still has received no word as to when, or if, Mrs. Mattera will comply with the discovery provisions of the PI Order.

## FACTUAL BACKGROUND

On November 17, 2011, the SEC filed a complaint with this Court alleging that Mattera had solicited over $12.5 million of investments in special purpose vehicles that purportedly held, but in fact did not hold, shares of desirable pre-IPO companies such as Facebook and Groupon. The same day, the SEC submitted an application for a Temporary Restraining Order seeking, among other things, expedited discovery and an asset freeze.

This Court granted the SEC's application for the temporary restraining order freezing Defendants' assets.  The asset freeze was continued by orders dated November 29, 2011 and December 1, 2011, described below.

### A.  The TRO and Orders

On November 17, 2011, this Court granted the SEC's application for an Order to Show Cause, Temporary Restraining Order, and Order Freezing Assets and Granting Other Relief ("TRO").  (ECF Docket No. 4; Decl. of Karen Willenken, dated May 22, 2012, ("Willenken Decl."), ¶ 10 & Ex. A at pp. A1 to A9).[1]  Among other provisions, the TRO provided that "discovery is expedited as follows: pursuant to Rules 26, 30, 31, 33, 34, 36 and 45 of the Federal Rules of Civil Procedure, and without the requirement of a meeting…the parties may...obtain the production of documents, within three (3) calendar days from service by facsimile, e-mail or otherwise of a request or subpoena, from any persons or entities, including non-party

---

[1]    Unless otherwise indicated, all references to Exhibits in this memorandum are to exhibits attached to the Willenken Declaration.

witnesses…."  The TRO provided that its discovery order "will remain in place beyond any hearing on the Commission's application for preliminary injunction."  (*Id.* at A7).

The TRO also provided for a temporary asset freeze, and it set a hearing on the SEC's application for a preliminary injunction for November 29, 2011 at noon.  (*Id.* at A4 – A6; A8).

The day the TRO was entered, the SEC sent copies by United Parcel Service ("UPS") overnight delivery to Mattera and his mother.  Mrs. Mattera personally received and signed for her package the next day.  (Ex. B at p. B1).

On November 29, 2011, Mattera entered into the Consent Order with the SEC.  (ECF Docket No. 25; Ex. A at A10 – A23).  The Consent Order provided, among other things, that Mattera must hold and retain within his control, and otherwise prevent any "withdrawal, transfer, pledge, encumbrance, assignment, dissipation, concealment, or other disposal" of any assets, including money and personal property, under his control, whether held in his name or for his direct or indirect beneficial interest.  (*Id.* at A-13-A-16).  The Consent Order set forth certain limited exceptions and conditions, including the assets pledged as collateral for his bail (so long as they remain pledged) and certain future income.  (*Id.* at A1 – A16).

Future income was excepted only if it met two conditions:  first, it was received "from sources other than any of the other defendants or relief defendants in this case," and second, it resulted from "activities that do not in any way involve the offer, purchase or sale of any security...."  (*Id.* at p. A-15, Section VI(2)).  Mattera was required to disclose any such income and deposit 25% of it into a Court Registry Investment System ("CRIS") account.  (*Id.*, Section VI(3)).  The Consent Order provided that Mattera could use credit cards or otherwise incur debt only up to the amount of the excepted future income or for reasonable travel expenses in connection with court appearances in New York.  (*Id.* at p. A-16, Section VI(4)).  Mattera was

required to disclose any receipt of excepted future income, and any use of credit cards, to the SEC in a sworn accounting on the fifth calendar day of each month.  (*Id.*, Section VI(5)).

The Consent Order also required Mattera to file a verified written accounting disclosing all of his assets and liabilities, transfers of assets or funds since January 1, 2010, and the names and last known addresses of "all bailees, debtors, and other persons and entities that are currently holding the assets, funds, or property of Mattera or any of the Mattera Entities."  (*Id.* at p. A19 – A20).  Mattera has not provided a verified written accounting, presumably on the ground that doing so would violate his Fifth Amendment rights.[2]  Mattera also petitioned this Court for an order staying this action against him based primarily on Fifth Amendment concerns; his application was granted to the limited extent that discovery from Mattera personally is stayed. (ECF Docket No. 27; Ex. A at A24).

Also on November 29, 2011, this Court held a preliminary injunction hearing.  Although Mrs. Mattera had received notice of the hearing – she had personally signed for her copy of the TRO on November 18, 2011 – she did not appear.  (Willenken Decl. at ¶ 11, 16-17 and Ex. B). This Court entered an order of preliminary injunction against Mrs. Mattera and the several non-appearing corporate defendants on December 1, 2011 (the "PI Order").  (ECF Docket No. 28; Willenken Decl. at ¶ 17 and Ex. A at pp. A25-A34).

The PI Order provided, among other things, that Mrs. Mattera must hold and retain within her control, and otherwise prevent any "withdrawal, transfer, pledge, encumbrance, assignment, dissipation, concealment, or other disposal (including the use of any credit cards or any other incurring of debt in excess of $1000)" of any assets, including money and personal

---

[2]  Mattera has submitted objections to the staff's request for the production of documents, and he has filed an Answer in which he asserted his Fifth Amendment rights.  (Willenken Decl. at 19 & Ex. D at pp. D9-D12). It does not appear, however, that he has provided a formal written statement explaining his non-compliance with the accounting requirement of the Consent Order.

property, under her control, whether held in her name or for her direct or indirect beneficial interest, "up to the amount of potential ill-gotten gains that Ann Mattera received from Defendants." (*Id.* at pp. A27 – A28).

Unlike the Consent Order concerning Mattera, the PI Order did <u>not</u> exclude from its asset freeze provision any income that Mrs. Mattera might earn after the date the order was entered. And unlike the Consent Order, which allowed Mattera to use credit cards in an amount not to exceed 75% of his excepted future income, the PI Order permitted Mrs. Mattera to incur only up to $1000 in debt. (*Id.*).

The PI Order also required Mrs. Mattera to repatriate any assets that were "obtained, directly or indirectly, from the activities described in the Commission's Complaint that are now located outside the jurisdiction of this Court" and to provide a verified written accounting. The accounting was to include:

(1) A list of all accounts at all banks, brokerage firms or financial institutions...electronic mail addresses...postal box numbers, safety deposit boxes, and storage facilities used or maintained by any one or more of the Non-Opposing Defendants at any time from January 1, 2010 to the present;

(2) All assets, liabilities and property currently held directly or indirectly by or for the benefit of the Non-Opposing Defendants...describing each asset and liability, its current location and amount;

(3) All money, property, assets, and other income received by the Non-Opposing Defendants, or for the direct or indirect benefit of one or more of them, in or at any time from January 1, 2010 to the date of the accounting, describing the source, amount, disposition, and current location of each of the items listed;

(4) All assets, funds, securities, real or personal property of the Non-Opposing Defendants transferred to or for the benefit of any other person or entity from January 1, 2010 to the date of the accounting, including a description of each transferred asset, the name of the recipient, and the date of the transfer; and

(5) The names and last known addresses of all bailees, debtors, and other persons and entities that are currently holding the assets, funds, or property of any one or more of the Non-Opposing Defendants.

(*Id.* at pp. A28 – A30).

Mrs. Mattera received notice of the PI Order.  It was sent to her by UPS overnight delivery, and a person named "Mattera" signed for the PI Order at 10:04 a.m. on December 2, 2011.  (Willenken Decl., ¶ 11 & Ex. B at p. B3).  Even before she received the physical document, she was on notice of its likely terms because she had received the TRO, which contained an asset freeze, and her son had already executed a Consent Order that included an asset freeze.

Although Mrs. Mattera is named only as a relief defendant in this action, her non-compliance with the PI Order significantly impairs the SEC's ability to recover investor funds that were improperly transferred to her.  Mrs. Mattera received far more of the fraud proceeds than she currently appears to have in her frozen bank and brokerage accounts.  She received transfers of investor funds of at least $1.9 million into her brokerage account, but as of October 31, 2011, the value of that account had declined to approximately $1.13 million.  (Declaration of Richard Needham, dated November 17, 2011, ECF Docket No. 13 ("Needham Decl."), ¶ 154; Willenken Decl. ¶ 29 and Ex. G).  The SEC is not aware of any facts to indicate that Mrs. Mattera has other assets with which to satisfy a potential judgment against her.  Moreover, Mrs. Mattera was not merely a passive recipient of the investor proceeds.  She was an officer or director of several of the entities involved in the scheme, she was one of the authorized signatories on all of the entities' bank accounts, and she frequently wrote checks on and withdrew cash from those accounts.  (Needham Decl. ¶ 98-100 & Exs. 21-23, 104-108; Willenken Decl., ¶ 24 & Ex. E).

**B. Mrs. Mattera Leased a New Audi Automobile and Luxury Condominium In Violation of the Asset Freeze Provision of the PI Order**

Mrs. Mattera violated the PI Order on December 2, 2011, when she entered into a lease for a 2012 Audi automobile (the "2012 Audi") from Audi of Coral Springs (the "Audi Dealership"). (Willenken Decl., ¶ 35 & Ex. M at pp. M1 – M3). The lease obligated her to make total payments of $59,854 over a period of 42 months, in monthly installments of $1,297.73. (*Id.*). The dealership's records reflect that she made a payment on that date of $5,000 cash. (*Id.* at p. M1 – M2). Her expenditure of cash to lease this automobile, and her acceptance of a future obligation to pay almost $55,000, violated the PI Order, which did not permit her to spend any cash and precluded her from incurring more than $1,000 in debt. (Ex. A at pp. A27-28).¶

Similarly, on December 15, 2011, Mrs. Mattera entered into a lease on a three bedroom, three bathroom condominium located at 455 E. Palmetto Park Road, Boca Raton, FL 33432 (the "New Condo"). (Willenken Decl., ¶ 32 & Ex. I). The monthly rent on this unit is $4,190. At the time of signing, Mrs. Mattera was required to pay $14,085.25, which included first and last months' rent, one months' rent as a security deposit, and prorated rent for December. (*Id.* at pp. I3 – I5). In violation of the PI Order, Mrs. Mattera paid the security deposit to Fifth Avenue Place on December 13, 2011, using funds in a previously existing BankAtlantic account. (*Id.* at p. I13).[3] Also in violation of the PI Order, Mrs. Mattera obtained a cashier's check from BankAtlantic in the amount of $9,895.25 on December 16, 2011 and provided it to Fifth Avenue Place to cover the first months' rent, last month's rent and prorated December rent. (*Id.* at p. I14). Because the cashier's check is not reflected as a withdrawal from the BankAtlantic

---

[3]    Although that account had existed at the time of the PI Order and the funds in the account were subject to the asset freeze, the SEC was not yet aware of the account in December 2011 and had not yet served a copy of the PI Order on the bank.

account, it appears that Mrs. Mattera used cash, or another undisclosed source of assets, to make this payment.  (Willenken Decl. at ¶ 32 & Ex. I at pp. I22 – I24).

### C.  Defendants Converted Frozen Personal Assets into Cash to Fund Secret Accounts

In late December 2011, Mrs. Mattera opened new accounts at two local banks:  Iberia Bank and Regent Bank (the "Secret Accounts").  (Willenken Decl., ¶ 33, 35 & Exs. J, L.)  Mrs. Mattera knew that the SEC had no knowledge of any accounts at these banks, because the PI Order included a list of Mrs. Mattera's known bank accounts.  (Willenken Decl., ¶ 17 & Ex. A at p. A34). Each of the Secret Accounts was opened with an initial deposit of approximately $100, but subsequently received tens of thousands of dollars from sources including a cashier's check payable to John Mattera, cash, and an import/export company doing business as "Barclays Jewelers."  (Exs. J, L).  In total, these two accounts received over $100,000 between December 2011 and early April 2012.  (Willenken Decl. at ¶ 33, 35 & Exs. J, L).

The chart below reflects the significant deposits into the two accounts:

| Account | Date | Amount | Deposit details |
|---|---|---|---|
| Iberia | 12/27/2011 | $105 | Cash |
| Regent | 12/30/2011 | $9,950 | Cash |
| Regent | 1/6/2012 | $5,000 | Cash |
| Regent | 1/10/2012 | $2,000 | Cash |
| Iberia | 1/17/2012 | $3,000 | Cash |
| Iberia | 1/19/2012 | $28,000 | Cashier's check payable to John Mattera (Ex. L at p. L15) |
| Regent | 1/20/2012 | $4,000 | Cash |
| Regent | 1/23/2012 | $4,000 | Cash |
| Regent | 2/1/2012 | $5,000 | Cash |
| Regent | 2/6/2012 | $5,000 | Cash |
| Iberia | 2/9/2012 | $5,000 | Cash |
| Regent | 2/10/2012 | $500 | Cash |
| Regent | 2/21/2012 | $2,000 | Cash |
| Regent | 2/22/2012 | $3,500 | Check from Toyota Deerfield Beach (Ex. J at p. J42) |

| Account | Date | Amount | Deposit details |
|---|---|---|---|
| Regent | 2/27/2012 | $8,500 | $3500 and $5000 checks from Barclays import and export Inc.  DBA Barclays jewelers (Ex. J at pp. J43 – J45) |
| Regent | 2/28/2012 | $1,000 | Cash |
| Regent | 3/7/2012 | $4,000 | Cash |
| Regent | 3/12/2012 | $2,500 | Cash |
| Regent | 3/15/2012 | $1,000 | Cash |
| Regent | 3/22/2012 | $4,000 | Cash |
| Regent | 3/27/2012 | $2,500 | Cash |
| Regent | 4/2/2012 | $3,500 | Cash |

The SEC is not aware of any source of income, other than the sale of frozen assets, that could explain deposits over $100,000 into Mrs. Mattera's accounts.  Since the Consent Order was entered, Mattera has certified to the SEC on a monthly basis that he has had no income through May 5, 2012 that falls within the future income exception to his asset freeze.  (Willenken Decl., ¶ 19 & Ex. D).  Mrs. Mattera claimed on a recent credit application that she is a realtor with a monthly income of $8,000, but the Florida Department of Business and Professional Regulation ("FDBPR") lists Mrs. Mattera's real estate licensing status as "Current, Inactive." (Willenken Decl., ¶¶ 31, 36 & Exs. H, M at M4).  According to the FDBPR glossary of terms on its website at myfloridalicense.com, "Inactive" status means that "the licensee has met the department's requirements for licensure but is not allowed to work under this license.  Licenses are usually inactive if the person . . . wants to remain in good standing while they pursue other ventures."  Moreover, income of $8,000 per month would explain only a fraction of the deposits into the Secret Accounts.

**D.  Defendants Used the Secret Accounts and Other Undisclosed Assets to Continue Their Luxurious Lifestyle in Violation of the Asset Freeze Orders**

Once deposited, these funds were used to write checks and send wires to a number of payees.  In total, over $100,000 has been withdrawn from the Secret Accounts in violation of the

9

Orders.  (Willenken Decl. ¶¶ 33, 35 and Exs. J, L).  Many of these withdrawals appear to have been made to maintain Mattera's luxurious lifestyle – including the expenses of a luxury condominium and membership at an exclusive resort – while others appear to relate to Mattera's business.  Some payments relate to Mrs. Mattera's living expenses.  The chart below provides the total amount paid to certain relevant payees, together with the total amount paid to the payee and a brief description of the likely purpose of the payment:[4]

| Payee | Total Amount | Payee Description / Payment Notes |
|---|---|---|
| American Express | $17,907 | Likely credit card expenses (Willenken Decl., ¶¶ 32-33 & Exs. I, J) |
| Capital One | $16,499 | Likely credit card expenses (Willenken Decl., ¶¶ 32-33 & Exs. I, J) |
| Maria Luisa Martini | $14,000 | Lessor of Mattera's former residence (Willenken Decl., ¶ 34 & Ex. K) |
| Palmetto 455 Inc. | $10,701 | Lessor of the New Condo[5] |
| Audi Financial | $4,040 | Payments on the 2012 Audi lease (Willenken Decl.  ¶¶ 36-37 & Exs. M at pp. M5 – M7, N) |
| 1600 N. Federal Hwy LLC | $3,152 | Likely lessor of Mattera's business address (Willenken Decl., ¶ 27 & Ex. F) |
| Broward Automotive | $2,436 | Purchase of the 2009 Audi (Willenken Decl., ¶ 37 & Ex. N) |

As the chart illustrates, many of the funds withdrawn from Mrs. Mattera's Secret Accounts were used to pay John Mattera's living expenses.  Although the New Condo is in Mrs. Mattera's name, Mattera has officially notified Judge Sullivan, to whom his criminal case has been assigned, that he recently moved to 455 East Palmetto Park Road, #4-W, Boca Raton "for the purpose of reducing his living expenses."  (Willenken Decl., ¶ 19 & Ex. D at pp. D7 – D8).  In addition, two substantial payments were made to Maria Luisa Martini, the lessor of Mattera's

---

[4]    The payments to the selected payees referenced in the chart  total approximately $70,000.  An additional approximately $50,000 was spent from the accounts for purposes such as cash withdrawals, utilities, miscellaneous expenses and bank charges.  Approximately $18,500 was credited back to the Secret Accounts for checks that bounced, so the net expenditures from the Secret Accounts appear to have been approximately $101,500.  (Willenken Decl. ¶¶ 33, 35 & Ex. J, L).

[5]    The landlord of the New Condo initially was the developer, Fifth Avenue Place, LLC.  Immediately after the lease was executed, however, Fifth Avenue Please assigned its rights to Palmetto 455 Inc.  (Willenken Decl., ¶ 31 & Ex. I at p. I-8).

previous home. (Willenken Decl., ¶ 33 & Ex. J at pp. J15, J17). Notations on one of these checks indicate that an additional cash payment of $4,000 had been made to Ms. Martini. (*Id.*) The cash payment, too, was a violation of the Orders for Mattera's benefit.

In addition, Mrs. Mattera has paid over $32,000 from the Secret Accounts to American Express and Capital One, making multiple payments to each payee in most months. (Willenken Decl., ¶ 33 & Ex. J). A credit check report indicates that Mrs. Mattera has accounts at both American Express and Capital One. (Willenken Decl., ¶ 32 & Ex. I, pp. I1 – I2). Thus, it appears that one or both of the Defendants have violated the Orders by incurring credit card debt, which Mattera is permitted to do only up to the amount of 75% of his non-existent excepted future income, and which Mrs. Mattera is permitted to do only up to the amount of $1,000.

On January 25, 2012, Mrs. Mattera visited the Audi Dealership and negotiated a trade-in of two existing automobiles – a 2004 Audi and a 2010 Toyota Corolla – for a 2009 Audi. In addition to trading in the existing automobiles, she was required to pay the difference in value of $2,436. Documentation of a wire transfer in that amount, dated February 15, 2010, contains the payment reference "Ann A. Mattera - Paid in Full - Payoff Car." (Willenken Decl., ¶ 36 & Ex. N). Both the trade-in of the existing automobiles, which were registered in Mrs. Mattera's name, and the payment of the difference in value, constituted blatant violations of this Court's PI Order.

In addition to the payments from the Secret Accounts, Mrs. Mattera has made a number of additional payments by cash, cashier's check or check from the pre-existing BankAtlantic account. These include a $5,000 down payment on the 2012 Audi (Ex. M at M2 – M3), a $4,000 cash payment to Maria Luisa Martini (Ex. J at J15, J17), a cashier's check for $9,895 for first and last months' rent on the New Condo (Ex. I at p. I14), and a cashier's check in the amount of

$4,709 paid in March 2012 for "replacement rent" (Ex. I at p. I19).  Taken together, these payments total $23,604.  Because the Secret Accounts and the pre-existing BantAtlantic account (see Ex. I at p. I20-I25) do not contain withdrawals in amounts corresponding to the value of the cashier's checks, it appears that Mrs. Mattera used other frozen assets, beyond those in the accounts, to obtain the cashier's checks.  When combined with the outflows reflected in the Secret Accounts, the Defendants' *known* expenditures since November 17, 2011 appear to be approximately $120,000.[6]

The violations are all the more egregious because, when combined with the lease of the 2012 Audi in December 2011, they resulted in an upgrade to Mrs. Mattera's luxurious lifestyle – and Mattera likely benefited as well.  On February 1, 2012, Mattera signed an agreement with Fifth Avenue Place Condominium One Association, Inc. for a parking space "For Ann Mattera." (Willenken Decl., ¶ 31 & Ex. I at pp. I9 – I11).  As a result of the Defendants' blatant violations of the Orders, instead of driving two cars of modest value (a 2004 Audi and a 2010 Toyota Corolla) the two of them are now driving two more luxurious cars (a 2009 Audi and a 2012 Audi).

Given that Mattera provided a cashier's check for a substantial amount of the money deposited into the Secret Accounts, and that he benefited from Mrs. Mattera's expenditures from the accounts, it appears that Mattera and his mother acted in concert when they opened the accounts and withdrew funds to pay their living and business expenses.

---

[6]    The exact amount is difficult to calculate because a large percentage of Mrs. Mattera's checks bounced. The estimate of total expenditures has been reduced by the approximately $18,500 of returned item credits reflected in the statements for the Secret Accounts.  (*See* Willenken Decl. at ¶ 34 and Ex. L).

**E. Mrs. Mattera Is in Violation of This Court's Orders to Disclose Her Assets**

Mrs. Mattera's brazen violation of this Court's asset freeze orders is compounded by her continued refusal to comply with her obligation under the PI Order to provide a verified written accounting, and her obligation under the TRO to respond to document requests from the SEC. Without the required disclosures, the SEC cannot be certain that it has identified all financial institutions and other third parties to whom notice of the PI Order should be sent. Accordingly, on April 2, 2012, the SEC sent Mrs. Mattera a letter in which it reminded her of her obligations under the PI Order and TRO, and it requested that she provide an accounting and her response to the SEC's document requests no later than April 9, 2012. (Willenken Decl., ¶ 22 & Ex. B). Mrs. Mattera has not responded to the letter and has not provided the ordered information. (Willenken Decl., ¶ 22).

The PI Order required Mrs. Mattera to provide "a verified written accounting, signed under penalty of perjury" providing, among other information, 1) a "list of all accounts at banks, brokerage firms or financial institutions" maintained by her or under her control; and 2) an accounting of all "money, property, assets, and other income received by [her], in or at any time from January 1, 2010, to the date of the accounting, describing the source, amount, disposition, and current location of each of the items listed." (Ex. A, pp. A29 – A30). The accounting was due within three days of the entry of the order. Mrs. Mattera never supplied the accounting, even after she was reminded by the SEC's email dated March 15, 2012 and its letter dated April 2, 2012. (Willenken Decl. at ¶¶ 21-22).

Without the accounting, the SEC cannot be sure that it has notified all relevant banks and other asset custodians about the PI Order. The SEC also needs the accounting in order to monitor Mrs. Mattera's compliance with her obligation to retain those assets while the PI Order is in effect.

13

On November 18, 2011, pursuant to the TRO, the SEC served upon all Defendants and Relief Defendants the Plaintiff's First Request for Production of Documents.  (Willenken Decl., ¶ 13 & Ex. C).  Production was called for within three calendar days from the date of service, as set forth in the TRO.  Among the discovery requested from Mrs. Mattera was the following:

14.      All bank and brokerage account statements for any accounts held wholly or in part by any Defendant or Relief Defendant; accounts controlled by any Defendant or Relief Defendant (including by any of the Other Mattera Entities); and accounts for which any Defendant or Relief Defendant is an authorized signatory.

15.      Documents sufficient to identify all safe deposit boxes or storage units controlled by any Defendant or Relief Defendant (including by any of the Other Mattera Entities).

16.      Documents sufficient to identify all real property, automobiles, boats, and jewelry with a value over $500 purchased by any Defendant or Relief Defendant during the Relevant Period.

By failing, in violation of the TRO, to provide the requested documents or raise any legitimate objection, Mrs. Mattera has thwarted the SEC's ability to monitor her compliance with the asset freeze provisions of the PI Order.

## LEGAL ARGUMENT

### A.  The SEC Has Satisfied the Prerequisites For A Finding of Civil Contempt

It is long-established that district courts have the inherent power to enforce compliance with their lawful orders through civil contempt.  *See Shillitani v. U.S.*, 384 U.S. 364, 370 (1966); *see also SEC v. Pittsford Capital Income Partners, LLC*, No. 06 Civ. 6353, 2010 WL 2025500, at *2 (W.D.N.Y. May 20, 2010); *SEC v. Levine*, 671 F. Supp. 2d 14, 26 (D.D.C. 2009) ("A district court has both inherent and statutory power to enforce compliance with its orders through the remedy of civil contempt.").  In addition, Congress codified the contempt power of the federal judiciary at 18 U.S.C. § 401, which provides, in relevant part, that "[a] court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such

contempt of its authority and none other, as . . . [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command."

The court may hold a party in civil contempt if the moving party shows that "[i] the order being enforced is clear and unambiguous, [ii] the proof of noncompliance is clear and convincing, and [iii] the defendants have not been reasonably diligent and energetic in attempting to accomplish what was ordered." *EEOC v. Local 638*, 753 F.2d 1172, 1178 (2d Cir. 1985) (citation and internal quotation marks omitted). The Court need not find that the noncompliant party's disobedience was willful. *See SEC v. Levine,* 671 F. Supp. 2d at 26 ; *SEC v. Universal Express, Inc.*, 546 F. Supp. 2d 132, 134 (S.D.N.Y. 2008).

The SEC clearly satisfies this burden. First, the Orders are clear. Indeed, at no point have either of the Defendants sought clarification of this Order. *See NBA v. Design Mgmt. Consultants, Inc.*, 289 F. Supp. 2d 373, 377 (S.D.N.Y.2003) ("An order is clear and unambiguous where it is specific and definite enough to apprise those within its scope of the conduct that is being proscribed or required.") (citation and internal quotation marks omitted).

Second, there is substantial evidence of noncompliance. Mrs. Mattera has violated the asset freeze provisions of the PI Order by, at a minimum, spending $5,000 of frozen cash to lease the 2012 Audi, incurring debt to lease the 2012 Audi and the New Condo, giving up two frozen automobiles in trade for the 2009 Audi, and writing checks from the frozen assets in the Secret Accounts to pay for various expenses for herself and Mattera. Mattera has violated the Consent Order by, at a minimum, transferring $28,000 of frozen assets to his mother and allowing her to spend frozen assets to pay his living expenses. It appears that he also drove a car obtained using frozen assets and incurred credit card debt in violation of the Consent Order.

15

In addition, it appears that one or both Defendants have liquidated assets to fund the Secret Accounts. Such activity would also violate the Orders, which prevent the transfer "or other disposal" of any covered assets. (Ex. A at pp. A14, A27).

Mrs. Mattera's failure to produce an accounting and to respond to the SEC's document requests also clearly violated the PI Order and the TRO. She has provided no response to the SEC's letter of April 2, 2012, in which it notified her of these deficiencies, gave her an opportunity to correct them, and warned her that it would seek a finding of contempt if she failed to comply.

Third, the diligence and energy exhibited by the Defendants has not been toward "accomplish[ing] what was ordered." *Local 638*, 753 F.2d at 1178. To the contrary, rather than attempting to preserve their assets as ordered, the Defendants opened secret bank accounts and funneled assets through them in order to maintain and, in some cases, upgrade their luxurious lifestyle. These actions reflect a concerted effort to thwart, rather than to accomplish, what this Court ordered.

As to the accounting and discovery requests, Mrs. Mattera appears to have exercised no diligence or energy whatsoever toward complying with this Court's orders. Mrs. Mattera let the November 22, 2011 deadline for document production pass without producing a single document or contacting the staff to discuss the requests. Calls from the staff to Mrs. Mattera to discuss a possible consent order and to verify her address went unanswered. (Willenken Decl. at ¶ 8, 9). More recently, Mrs. Mattera refused to respond in any way to an email and letter reminding her of her obligations.[7] (Willenken Decl. at ¶ 21, 22 and Ex. B, pp. B5 – B9).¶

---

[7]    Mrs. Mattera also has failed to answer the Complaint and has offered no justification for failing to do so. The SEC intends to seek a default judgment against her.

16

For these reasons, the Defendants' non-compliance is clear and convincing, and the lack of diligence in complying with the TRO and the Orders is remarkable. The only question remaining is the scope of the relief to be awarded.

**B. The Relief Requested for the Contemptuous Conduct of the Defendants**

Once contempt has been established, a district court has "broad discretion to fashion an appropriate coercive remedy . . . based on the nature of the harm and the probable effect of alternative sanctions." *EEOC v. Local 28*, 247 F.3d 333, 336 (2d Cir. 2001) (quoting *N.A. Sales Co. v. Chapman Indus. Corp.*, 736 F.2d 854, 857 (2d Cir. 1984)). "Civil contempt sanctions may serve to: (1) secure future compliance with the court's orders (a 'coercive sanction'); and (2) compensate the wronged party (a 'compensatory sanction')." *Leser v. U.S. Bank Nat'l Ass'n*, No. 09 Civ. 2362, 2011 WL 1004708, at *10 (E.D.N.Y. Mar. 18, 2011) (citing *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Tech., Inc.*, 369 F.3d 645, 657 (2d Cir. 2004)). "The Second Circuit has counseled that when imposing penalties for a coercive purpose, the district court should consider several factors including: (1) the character and magnitude of the harm threatened by the party's continued noncompliance; (2) the efficacy of the sanction in bringing about compliance; and (3) the contemnor's ability to pay." *Id.* at *11 (citing *Paramedics*, 369 F.3d at 658); *see also SEC v. Bremont*, No. 96 Civ. 8771, 2003 WL 21398932, at *7 (S.D.N.Y. June 18, 2003). As to compensatory sanctions, "[w]hen deciding whether to award fees, courts have focused on the willfulness of the contemnor's misconduct." *Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir. 1996). "A willful contempt is one where contemnor had actual notice of the court's order, was able to comply with it, did not seek to have it modified, and did not make a good faith effort to comply." *N.Y. State Nat'l Org. for Women v. Terry*, 952 F. Supp. 1033, 1044 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 86 (2d Cir. 1998) (citation and internal quotation marks omitted).

17

For the contemptuous conduct described above, the SEC respectfully requests that the Court enter an Order directing that Mattera and Mrs. Mattera appear in person and testify before the Court to show cause why they should not be held in contempt for violating the Orders and the TRO and why the following relief should not be granted against them:

First, that Mattera and Mrs. Mattera each be ordered to pay to the CRIS account for safekeeping, the funds they have dissipated.

Second, that Mrs. Mattera be ordered to comply with the accounting and discovery provisions of the TRO and the PI Order and to disclose in an additional accounting the same information, to the extent known to her, for Mattera and his entities.

Third, that Mattera and Mrs. Mattera be ordered to produce documents sufficient to identify all financial institution accounts, safety deposit boxes, rental storage facilities, boat marina slips and other locations in which their assets are currently maintained, and to update their production each time a new account or storage location is used while the Orders remain in effect.  The order should require them to include any documents reflecting the name or address of the financial institution or storage location, or the name, telephone number or electronic mail address of their primary point of contact at the financial institution or storage location.  Although Mattera has previously indicated his intention to assert his Fifth Amendment rights in response to document requests concerning the alleged securities fraud, and there is a discovery stay in place against him with respect to those issues, the SEC believes that discovery concerning his compliance with the Consent Order is a separate matter and that discovery for the

18

purpose of determining his current assets, and monitoring his future compliance with the Consent Order, is appropriate.

Fourth, to facilitate monitoring of the Defendants' compliance with this Court's asset freeze Orders, that each Defendant be ordered to identify each item of real or personal property, including but not limited to stock certificates, cash, currency, jewelry, or other valuables, that has been in his or her possession or control at any time since November 17, 2011, regardless of when it was acquired, and indicate the current location of the asset. In lieu of disclosing any or all such assets and their location in a written document, either Defendant may choose to produce to the SEC documents sufficient to identify the asset, its current owner or custodian and its current location, or he or she may bring the asset to the SEC's offices in Miami for physical inspection at a date and time, on or before May 31, 2012 unless otherwise agreed in writing by the parties, to be determined by the SEC.

The SEC also requests that, pending the hearing, the Defendants be ordered to pay to the CRIS account established in this case all funds transferred by them, as evidenced in Exhibits I-N of the Willenken Declaration.

The SEC seeks authority to serve all papers relating to its Application upon Mattera and Mrs. Mattera in electronic or paper form by United Parcel Service and/or certified mail, and to serve other defendants and relief defendants by email with copies of the Order to Show Cause and this memorandum of law only. Finally, the SEC respectfully requests leave to apply to this court for an award of sanctions and/or attorney's fees if evidence developed at the show cause

19

hearing confirms the staff's allegations concerning the Defendants' willful violations of the TRO and the Orders.

## CONCLUSION

For the reasons set forth above, the SEC respectfully requests that the Court enter an Order to Show Cause why the Defendants should not be held in civil contempt for violating the TRO and the Orders.

Dated: May 22, 2012
New York, New York

SECURITIES AND EXCHANGE
COMMISSION

By: _____
Karen E. Willenken
Neal Jacobson

ATTORNEY FOR THE APPLICANT
New York Regional Office
3 World Financial Center, Room 400
New York, New York 10281
(212) 336-0140 (Willenken)
E-mail: WillenkenK@sec.gov

Of Counsel:

Andrew M. Calamari
Alistaire Bambach
Neal Jacobson
Todd D. Brody
Preethi Krishnamurthy
Michael J. Osnato, Jr.

20

## CERTIFICATE OF SERVICE

I hereby certify that, on May 22, 2012, I caused true copies of the foregoing document to be served via e-mail and certified mail upon Ann A. Mattera and via e-mail and ECF upon the other following persons:

John A. Mattera, johnmattera1@me.com

Bradford Van Siclen, bradfordvansiclen@gmail.com

David E. Howard II, david.e.howard@hotmail.com

John R. Arnold, jr@fasttransmittals.com

Joseph Almazon
      Through his counsel, Gerald A. Adler,Esq., gadler@newmanmorrison.com

Spartan Capital Partners
      Through its counsel, Gerald A. Adler,Esq., gadler@newmanmorrison.com

The Praetorian Global Fund, Ltd.
      Through its Managing Director, Bradford Van Siclen, bradfordvansiclen@gmail.com

Praetorian G Power I, LLC through Praetorian G Power VI, LLC
      Through their Managing Member, Bradford Van Siclen, bradfordvansiclen@gmail.com

First American Service Transmittals, Inc.
      Through its President, John R. Arnold, Director, jr@fasttransmittals.com

Lan T. Phan
      Through her counsel, David R. Chase, Esq., david@davidchaselaw.com

Executive Source Holding, LLC
      Through its counsel, Gerald A. Adler,Esq., gadler@newmanmorrison.com

Karen E. Willenken

Dated:  May 22, 2012