UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
SECURITIES AND EXCHANGE
COMMISSION,

                                        Plaintiff,

                    -against-

JOHN A. MATTERA, ET AL.,

                                        Defendants.
------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _11 - 7 - 13_

11 Civ. 8323 (PKC)

MEMORANDUM
AND ORDER

P. KEVIN CASTEL, District Judge

        The Securities and Exchange Commission ("SEC") has filed a motion for

disgorgement, civil penalty, and extension of asset freeze against defendants Joseph Almazon

and a non-existent entity known as Spartan Capital Partners ("Spartan"), as well as relief

defendant Executive Source Holding LLC  ("Executive Source").  (Docket # 151.)  Joseph

Almazon, who is pro se, opposes the motion, asserting that the disgorgement amount and

penalties requested are unreasonable and that the asset freeze should be lifted with respect to

some of his assets.  (Docket # 160.)

        Almazon and Spartan, the name under which Almazon conducted business, are

named as defendants in a complaint.  The complaint asserts that Almazon invested personally,

and solicited the investments of others, in special purpose vehicles that falsely claimed to hold

shares in pre-IPO companies.  (Docket #1.)  Almazon entered into a consent judgment in which

this Court enjoined him from violating section 5 of the Securities Act of 1933 ("Securities

Act") and section 15(b) of the Securities Exchange Act of 1934 ("Exchange Act").  (Docket

# 71.)  The consent judgment extended to Spartan and Executive Source, entities which

Almazon solely controls.  (Id.)  The consent judgment left to a later date the determination of

disgorgement and civil penalties, and expressly allowed for future discovery relating to the same. (Id.)

The SEC has filed this motion, requesting disgorgement of $431,502.51, jointly and severally between the defendants together with prejudgment interest. (Docket # 152.)  The SEC also requests that Almazon and Spartan pay third-tier civil penalties of $431,502 each, as well as an extension of the asset freeze over Almazon's accounts until final disposition of the action. (Id.)  Because Spartan is nothing more a name under which Almazon conducted business, Almazon and Spartan will be treated as one and referred to as "Almazon."

## STATEMENT OF FACTS

By reason of the express provisions of section III of the parties' consent judgment, the allegations of the Complaint are accepted and deemed as true by the Court. (See Docket # 71.)  Additional facts are taken from Almazon's sworn deposition of May 17, 2013. (Willenken Supplemental Decl. Ex. K.)

In 2009, defendant Almazon took a position with ProTrade Securities ("ProTrade") managing day traders. (Id. at 24–25.)  Almazon's duties included "growing ProTrade's presence" and conducting branch reviews. (Id. at 28.)  Almazon did not hold any securities licenses, never sold securities on ProTrade's behalf, and did not think he would have been authorized to do so. (Id. at 29–30.)

Almazon conducted most of his business using Executive Source accounts. (Id. at 237.)  Initially, the accounts only contained funds provided by Almazon and his close friends and relatives. (Id. at 20–21.)  Using Executive Source accounts, Alamazon would occasionally take in money from traders as a "training fee." (Id. at 26–27.)  Training fees were typically small, ranging from a "couple hundred" to a "couple thousand" dollars  (Id.)

In late 2010, Almazon received a cold call from an employee of Dave Howard regarding foreign exchange trading.  (Id. at 10, 15–16.)  Howard also introduced Almazon to the Praetorian fund, an investment vehicle that purportedly held shares of pre-IPO securities and solicited his investment.  (See Compl. ¶¶ 52–53.)  In early 2011, Almazon decided to invest with a Praetorian fund that claimed to contain shares of Fisker, a pre-IPO company.  (Id. ¶¶ 53–55.)  Initially, Almazon invested on his own behalf using funds belonging to both himself and Executive Source.  (See Willenken Supplemental Decl. Ex. K, at 36, 74.)  Included in the invested Executive Source funds were the proceeds of loans that Almazon had obtained on Executive Source's behalf.  (Id. at 96.)  When Almazon read the paperwork for his investment, he noticed that the offer, as per SEC regulations, was only available to people with a net worth of over $1.5 million.  (Id. at 80.)  When he questioned Praetorian about this, its representatives assured him that he fell into an exemption and need not worry.  (Id. at 80–81.)  Almazon did not pursue the matter further.  (Id.)

Subsequently, Almazon's colleagues expressed interest in also making an investment with the Praetorian fund.  (Id. at 75.)  At Praetorian's request, Almazon took investment capital from his colleagues and pooled it with his own before sending the entire pool to Praetorian.  (Id.)  Once Almazon received the shares from Praetorian, he was to distribute them to his co-investors.  (Id.)

Around April, 2011, Praetorian approached Almazon concerning other funds.  (Id. at 98.)  Praetorian told Almazon that if he introduced investors to the Praetorian funds representing shares of Facebook, Zynga, and Groupon, none of which were yet public, Almazon would get an introduction fee of 10% of the investment.  (See id. at 48–54.)  Almazon was to split the 10% commission with Eastern Institutional Funding ("EIF"), which acted as his liaison to Praetorian.  (See id.)  Payments to Almazon were to be made through EIF.  (See id. at

54.) Praetorian also told Almazon that he could sell shares at a markup to his clients. (Id. at 52.) During the summer of 2011, using a team of interns, Almazon began finding investors for Praetorian and sold shares of Praetorian entities. (Compl. ¶¶ 61–64.)

At first, Almazon had investors fill out paperwork which he then forwarded to Praetorian directly. (Willenken Supplemental Decl. Ex. K, at 110–11.) Soon after, however, Praetorian instructed Almazon to route funds from investors through Executive Source. (Id. at 114.) Praetorian explained that from that point forwards, Almazon was selling shares of Executive Source, which, in turn, owned shares of Praetorian. (Id. at 114–120.) When Almazon again asked about the legality of this process, Praetorian assured him that everything conformed with securities regulations. (Id. at 132–35.) At no time did Almazon attempt to get independent advice regarding the Praetorian transactions. (See id. at 135.)

The SEC brought the present action against Almazon for sales of unregistered securities, in violation of section 5 of the Securities Act, and acting as an unregistered broker-dealer, in violation of section 15 of the Exchange Act. (Compl. ¶¶ 115–22.) Without admitting or denying the allegations of the complaint, Almazon entered into a consent judgment in which he waived any findings of fact and conclusions of law, waived any right of appeal, and agreed to pay disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty. (J. as to Defs. Almazon and Spartan and Relief Def. Executive Source 1.) The consent judgment provides that the amounts of disgorgement and penalty are to be determined by the Court. (Id. at 3)

DISCUSSION

I.      Defendant Almazon  Is Ordered to Pay $390,376.95 and Relief
        Defendant Executive Source Is Ordered to Pay $309,089.00, Plus
        Prejudgment Interest in Disgorgement.

Disgorgement of illicit profits is a proper equitable remedy for violations of the

securities laws.  See SEC v. Tome, 833 F.2d 1086, 1096 (2d Cir. 1987) (disgorgement "is a

method of forcing a defendant to give up the amount by which he was unjustly enriched."

(internal quotation marks and citation omitted)).  "The remedy consists of factfinding by a

district court to determine the amount of money acquired through wrongdoing . . . ."  SEC v.

Cavanagh, 445 F.3d 105, 116 (2d Cir. 2006).  Consequently, a district court has "broad

discretion not only in determining whether or not to order disgorgement but also in calculating

the amount to be disgorged."  SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1474–75 (2d Cir.

1996).

"The primary purpose of disgorgement orders is to deter violations of the

securities laws by depriving violators of their ill-gotten gains."  SEC v. Fischbach Corp., 133

F.3d 170, 175 (2d Cir. 1997).  Because the distribution of disgorged profits to fraud victims is a

secondary goal, "the size of a disgorgement order 'need not be tied to the losses suffered by

defrauded investors.'"  Official Comm. Of Unsecured Creditors of WorldCom, Inc. v. SEC,

467 F.3d 73, 81 (2d Cir. 2006) (quoting Fischbach Corp., 133 F.3d at 175–76).  In situations

where the disgorgement amount cannot be accurately measured, it must "be a reasonable

approximation of profits causally connected to the violation."  SEC v. Warde, 151 F.3d 42, 50

(2d Cir. 1998) (quoting SEC v. Patel, 61 F.3d 137, 139 (2d Cir. 1995)).  Any risk of uncertainty

falls on the party who created the uncertainty.  Id. (citing Patel, 61 F.3d at 140).

Once the SEC has made a reasonable showing of defendants' illicit profits, the

burden shifts to the defendants to show that the disgorgement figure is not a reasonable

5

approximation. <u>SEC v. Opulentica, LLC</u>, 479 F. Supp. 2d 319, 330 (S.D.N.Y. 2007).
Ultimately, the SEC bears the burden of persuasion that its disgorgement figure reasonably
approximates the amount of unjust enrichment. <u>See</u> <u>id</u>.

It is not possible to obtain an accurate measure by which Almazon was enriched.
By his own admission, Almazon did not keep accurate records of any transactions and
commingled money between accounts. (<u>See</u> Willenken Supplemental Decl. Ex. K, at 69–71,
244–45). Consequently, the SEC has sought disgorgement in the amount of $431,502, which it
views as a reasonable approximation. (<u>See</u> Pl. Mem. of Law in Supp. of its Mot. for
Disgorgement, Civil Penalty and Extension of Asset Freeze against Defs. 8.) This figure
represents the amount of funds the SEC alleges were retained by Executive Source from
investor funds ("Retained Amount") and a "commission" Almazon received for forwarding
investor funds to Praetorian. (<u>Id.</u> at 8–9.) The SEC also requests prejudgment interest on the
disgorgement amount. (<u>Id.</u> at 10–11.) The Court reviews each component figure, in turn, to
assess its reasonableness.

a.   The Retained Funds

In determining the amount retained by Executive Source, the SEC analyzed
bank records, subscription agreements, and wire transfer confirmations to identify likely
attempted investments in the Praetorian entities. (<u>Id.</u> at 9.) Once the investments had been
identified, the SEC computed an "expected" markup that should have been charged for the
apparent investments. (<u>Id.</u>) The SEC found the expected markup to be $194,634. (<u>Id.</u>) As a
second computation, the SEC next identified transfers of funds from Executive Source to
Praetorian's purported escrow agent and compared it to the amount invested. (<u>Id.</u>) The
difference between the two values provided a Retained Amount of $334,089, which the SEC
asserts is a more appropriate measure of the compensation Executive Source received. (<u>Id.</u>)

Almazon claims that the SEC is not entitled to assume that the retained amount was all compensation to Executive Source and the expected markup of $194,635, a figure close to his own calculation of $197,000, is a more appropriate measure.  (Def. Answer and Objection to Pl. Mot. for Disgorgement, Civil Penalty and Extension of Asset Freeze against Defs. 5.) Almazon, does not, however, offer an explanation for the $139,455 discrepancy between the expected markup of $194,634 and the Retained Amount of $334,089, asserting, rather, that the SEC's methodology was flawed.  (Id.)

The SEC's identified transactions appear to be reasonable.  Based on Almazon's sworn testimony, his dealings with Praetorian fell into three distinct, identifiable time periods representing supposed investments with Fisker, supposed investments with Groupon, and supposed investments with Facebook and Zynga.  (See Willenken Supplemental Decl. Ex. K, at 35, 49–50.)  During those time periods, Almazon routed investor funds through Executive Source to make purchases.  (Id. at 114–116.)  Almazon also used Executive Source accounts to collect "training fees" from traders.  (Id. at 26–27.)  In contrast to the size of investments Almazon took in, "training fees" were typically small, around a "couple hundred" dollars, but could be as high as a "couple thousand" dollars.  (Id.)

The transactions the SEC has identified fall into the appropriate timeframes and are for significant amounts of money leading to the conclusion that they are not "training fees" and represent investments that were sent to Praetorian.  (See Coppola Decl. Ex. 4.) Furthermore, some of the transactions identified specifically mention Fisker, Groupon, Facebook, or Zynga, indicating that the money from the transactions was to be used to purchase Praetorian funds.  (Id.)  The transactions that do not include memo fields are for similar quantities and took place at similar times, leading to the conclusion that money from those transactions was also destined for Praetorian.  (See id.)

Because the transactions the SEC identified appear to be related to the Praetorian funds, the burden shifts to Almazon to show that the SEC misidentified or mischaracterized transactions. See Opulentica, LLC, 479 F. Supp. 2d at 330. Almazon asserts that the SEC has misidentified a number of transactions, or that funds had already been returned to some investors before the fraud had been exposed. (Def. Answer and Objection to Pl. Mot. for Disgorgement, Civil Penalty and Extension of Asset Freeze against Defs. 5.) Almazon, however, does not provide evidence to substantiate this claim. Rather, he requests a hearing at which witnesses may be called to attest to the purpose of their money transfers to Executive Source. (Id.) But, the consent judgment explicitly afforded Almazon the opportunity to conduct discovery on the issue of disgorgement. (J. as to Defs. Almazon and Spartan and Relief Def. Executive Source 3.) In opposition to the SEC's motion, Almazon has had a full and fair opportunity to come forward with evidence. If there had been a disputed issue of fact raised by competing submissions of evidence, a hearing would be appropriate. But, in response to the SEC's well-supported motion, the opposing party may not refrain from showing his evidence unless, and until, a hearing is held.

In one instance, Almazon has specifically identified a transaction for which the money had already been returned, that of Neil Strosneider in the amount of $25,000. (Def. Answer and Objection to Pl. Mot. for Disgorgement, Civil Penalty and Extension of Asset Freeze against Defs. 5.) Accordingly, this amount will be removed from the deposit total. Therefore, the Court finds that the amount of money transferred to Executive Source for purposes of investment in Praetorian funds, and not returned, was $1,993,348.

There does not appear to be any dispute with regards to the amount of money sent from Executive Source to the purported escrow account. Consequently, for purposes of computing a retained amount, the Court will use the SEC-provided figure of $1,684,259.

(Coppola Decl. Ex. 7, at 2.)  The difference between the funds taken into the Executive Source account and those taken out of the account is therefore $309,089.  Though the amount may not be an accurate reflection of Almazon's profits, it is a reasonable measure of them due to the uncertainty present in the Executive Source account itself.  Absent an accounting by Almazon, who, through his actions, created the uncertainty regarding the status of these funds, it is appropriate to conclude that the funds remained with Executive Source and were not sent to Praetorian.  Therefore, the Court finds that the amount to be disgorged by Almazon and Executive Source from investments taken in by Executive Source is $309,089.

### b.  The Commission

In the course of Almazon's dealings regarding Praetorian assets, he obtained a commission of 10%, which he shared with EIF.  (Willenken Supplemental Decl. Ex. K, at 141–42.)  On average, Almazon retained 5% of the commission, which he received from EIF.  (Id. at 54.)  The SEC has identified transfers from EIF to Executive Source and Spartan which include Almazon's commissions.  (See Coppola Decl. Ex. 11.)  The transfers identified do no not, however, accurately reflect Almazon's total commission.  In addition to his Praetorian dealings, Almazon testified that he did "a lot of other business" with EIF as well and, consequently, cannot specifically identify which received transfers correspond with which business.  (Willenken Supplemental Decl. Ex. K, at 54.)  Almazon's testimony shows that he was offered the commissions in April, 2011, after his involvement in the initial Fisker deal.  (Id. at 48–50.)  Given that specific EIF transactions cannot be traced to the Praetorian commissions, a value of 5% of the money sent out for the Facebook, Groupon, and Zynga transactions would be an appropriate approximation.  For these transactions, Almazon transferred $1,625,759 to the purported escrow account.  (See Coppola Decl. Ex. 7.)  Therefore, the Court finds the

appropriate amount to be disgorged by Almazon of transfers from EIF to be 5% of $1,625,759, or $81,287.95.

### c.  Prejudgment Interest

"The decision whether to grant prejudgment interest and the rate used if such interest is granted are matters confided to the district court's broad discretion . . . . In deciding whether an award of prejudgment interest is warranted, a court should consider (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court. . . . When the SEC itself orders disgorgement . . . the interest rate it imposes is generally the IRS underpayment rate, . . . [which] reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its [illegal activity]." First Jersey Secs., Inc., 101 F.3d at 1476 (citations omitted).  These factors all weigh in favor of granting prejudgment interest at the IRS underpayment rate.

Therefore, Almazon is ordered to disgorge $390,376.95, plus prejudgment interest thereon.  Executive Source is ordered to disgorge, jointly and severally with Almazon, $309,089 of the total, plus prejudgment interest thereon.  Prejudgment interest shall be paid at the IRS underpayment rate.

### II.    The Civil Money Penalties

The Court may order civil monetary penalties for the Securities Act violations at issue.  15 U.S.C. § 77t(d)(2); see SEC v. Palmisano, 135 F.3d 860, 865 (2d Cir. 1998).  There are three separate "tiers" of potential penalties, which increase depending upon the seriousness of the violation.  15 U.S.C. § 77t(d)(2); 17 C.F.R. § 201.1005.  In the first tier, for non-scienter violations, "the amount of the penalty shall not exceed (i) the greater of $7,500 for a natural

person or $75,000 for any other person, or (ii) the gross amount of pecuniary gain to such

defendant as a result of the violation." 15 U.S.C. § 77t(d)(2); 17 C.F.R. § 201.1005.  In the

second tier, where the violation "involved fraud, deceit, manipulation, or deliberate or reckless

disregard of a regulatory requirement," the penalty "shall not exceed the greater of (i) $75,000

for a natural person or $375,000 for any other person, or (ii) the gross amount of pecuniary gain

to such defendant as a result of the violation." 15 U.S.C. § 77t(d)(2); 17 C.F.R. § 201.1005.

And in the third tier, where the violation (I) "involved fraud, deceit, manipulation, or deliberate

or reckless disregard of a regulatory requirement" and (II) "directly or indirectly resulted in

substantial losses or created a significant risk of substantial losses to other persons," the penalty

"shall not exceed the greater or (i) $150,000 for a natural person or $725,000 for any other

person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the

violation." 15 U.S.C. § 77t(d)(2); 17 C.F.R. § 201.1005.

        The amount of the penalty should be determined "in light of the facts and

circumstances" surrounding the violations. Id.  "Civil penalties are designed to punish the

individual violator and deter future violations of the securities laws." Opulentica, LLC, 449 F.

Supp. 2d at 331; see also SEC v. Ramoil Mgmt., Ltd., 01 Civ. 9057(SC), 2007 WL 3146943, at

*13 (S.D.N.Y. Oct. 25, 2007) (noting that civil penalties "are intended to fulfill a number of . . .

important purposes [other than punishment] such as disgorgement of ill-gotten gains,

deterrence, fostering public confidence in the securities system, and promoting stability in the

securities market").  Factors that are relevant to a determination of whether a civil penalty is

appropriate, and the amount of the fine, include "(1) the egregiousness of the defendant's

conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created

substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's

conduct was isolated or recurrent; (5) whether the defendant has admitted wrongdoing; and (6)

whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." See Opulentica, LLC, 479 F. Supp. 2d at 331. "While these factors are helpful in characterizing a particular defendant's actions, the civil penalty framework is of a 'discretionary nature' and each case 'has its own particular facts and circumstances which determine the appropriate penalty to be imposed.'" Id. (quoting SEC v. Moran, 944 F. Supp. 286, 296–97 (S.D.N.Y. 1996)).

The SEC seeks third-tier penalties against Almazon and Spartan equal to their pecuniary gain, or $390,376.95 for "each of them." (Pl. Mem. of Law in Supp. of its Mot. for Disgorgement, Civil Penalty and Extension of Asset Freeze against Defs., 17.) There is no dispute that Almazon's conduct created substantial losses or the risk of substantial losses to other persons. There is not substantial evidence tending to show that Almazon intended to defraud investors, or acted with "reckless disregard of a regulatory requirement."

Reckless conduct is "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant had to have been aware of it." Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (quotation omitted). In cases concerning the sale of unregistered securities, courts have found reckless disregard for regulatory requirements when the defendant was either a licensed broker, or in a position to know of the existence of regulatory requirements. See, e.g., SEC v. Elliott, No. 09 Civ. 7594(KBF), 2012 WL 2161647, at *4, *8 (S.D.N.Y. June 12, 2012) (finding reckless disregard when the defendant passed a Series 7 exam and had substantial expertise in the industry); SEC v. Universal Express, Inc., 646 F. Supp. 2d 552, 559, 568–69 (S.D.N.Y. 2009) (finding reckless disregard when the defendants were a securities trader and an investment advisor).

12

Almazon was not a sophisticated investor or actor.  Almazon did not sell other securities and was not a licensed broker.  (Willenken Supplemental Decl. Ex. K, at 29–30.)  Before he sold securities on Praetorian's behalf, he first invested with Praetorian himself.  (Id. at 34–37.)  At every stage of Almazon's involvement, he was assured by representatives of Praetorian that his actions were in compliance with securities laws.  (Id. at 51, 80–81, 114–120, 132–35.)  He did not, however, seek outside advice.  (See id. at 135.)  Given that Praetorian was attempting to induce his investment, Almazon's reliance on its representations was unreasonable.  Consequently, though his disregard of regulatory requirements was negligent, I cannot conclude that his actions rose to the level of recklessness as required for the imposition of third-tier penalties.

Therefore, a first tier penalty is appropriate.  Furthermore, Almazon has admitted to his wrongful conduct, which was isolated to interactions with Praetorian.  Almazon is ordered to pay a penalty in the amount of $50,000.

III.   The Asset Freeze Shall Remain in Force for an Additional Thirty Days.

The SEC requests an extension of the asset freeze currently in effect to ensure that it can seek to apply the assets in partial satisfaction of this judgment.  Almazon contends that not all assets currently under his control actually belong to him and, as such, the asset freeze should be lifted with respect to those assets.  Because Alamazon intermingled funds in his accounts and did not keep accurate records, it is not possible to disentangle his purported assets from those which may belong to others.  (See id. at 237–40.)  Almazon has not submitted any evidence detailing which assets do not belong to him and should therefore be separated out from his accounts.  In the absence of any clear separation of assets, the Court concludes that a continuation of the asset freeze for all accounts currently frozen is appropriate.

With regards to the frozen assets, the SEC intends to file a further motion seeking to have them turned over to criminal authorities handling a distribution in the criminal case, or paid to the SEC.  To assist both the SEC and this Court, Almazon is encouraged to provide documentation and evidence detailing the source of the funds in his various accounts, if he is able to do so.

## CONCLUSION

For the foregoing reasons, defendant Almazon is ordered to disgorge $390,376.95, plus prejudgment interest thereon.  Executive Source is ordered to disgorge, jointly and severally with Almazon, $309,089 of the $390,376.95, plus prejudgment interest thereon.  Prejudgment interest shall be paid at the IRS underpayment rate.  Almazon is ordered to pay a civil money penalty in the amount of $50,000.  The asset freeze shall remain in force for an additional thirty days.

Counsel for the SEC is directed to supply defendant Almazon with copies of all unreported decisions cited herein.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
November 6, 2013

14