```
┌────────────────────────────────────┐
│ USDS SDNY                           │
│ DOCUMENT                            │
│ ELECTRONICALLY FILED                │
│ DOC #: _____              │
│ DATE FILED: 12-9-13                 │
└────────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
SECURITIES AND EXCHANGE
COMMISSION,

                                   Plaintiff,                    11 Civ. 8323 (PKC)

          -against-                                             MEMORANDUM
                                                                AND ORDER
JOHN A. MATTERA, ET AL.,

                                   Defendants.
-------------------------------------------------------x

CASTEL, District Judge:

          The Securities and Exchange Commission ("SEC") asserts that John Mattera, in

violation of section 5 of the Securities Act of 1933 ("Securities Act"), section 17(a) of the

Securities Act, section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule

10b-5 thereunder, solicited investments in special purpose vehicles that falsely claimed to hold

shares in pre-IPO companies and that David Howard, in violation of section 5 of the Securities

Act, assisted in the solicitation and sales. (Docket # 1.) The SEC now moves for summary

judgment against Mattera and Howard, and other relief.

          Mattera, who is pro se, has not submitted a response to the SEC's motion. In

opposition, Howard, who is also pro se, characterizes his actions as "introductions," rather than

"solicitations," and claims that, as such, they should not expose him to liability under section 5.

In response to the SEC's well-supported summary judgment motions, Mattera and Howard have

failed to come forward with evidence that, if believed, would permit a reasonable fact-finder to

find in their favor on the issue of liability. Howard has, however, submitted enough evidence

that would permit a reasonable fact-finder to find that he did not act with the requisite level of

scienter to justify third-tier penalties. For the reasons discussed, the SEC's motions for summary

judgment are granted with respect to Mattera and Howard's liability, but denied with respect to civil money penalties against Howard.

BACKGROUND

I.     Procedural History

The SEC alleges that Mattera, Howard, and the other named defendants engaged in the fraudulent and sales of securities. (Compl. ¶ 1, Docket # 1.) Specifically, the Complaint alleges that the defendants solicited more than $12.6 million in investments in special purpose investment vehicles ("SPVs"). In these SPVs, the defendants purported to hold shares in certain privately-held companies expected to launch initial public offerings. (Id. ¶¶ 1–4.) The Complaint further alleges that the SPVs did not in fact hold such shares and Mattera simply transferred investor funds to accounts under his control. (Id. ¶ 5.)

Previously, the SEC applied to the Court for a Temporary Restraining Order, and Order Freezing Assets and Granting Other Relief ("TRO"). (Docket # 4.) The Court granted the SEC's application and set the matter for a preliminary injunction hearing. (Id.)

At the hearing, the SEC presented the Court with a Stipulation and Consent Order Imposing Preliminary Injunction and Other Relief Against Defendant John A. Mattera (the "Consent Order") signed by Mattera. (Docket # 25.) The Consent Order was entered as an Order of the Court and filed that same day and a similar order was entered against Howard. (Id.; Docket # 23.)

The Consent Order ordered Mattera to hold and retain within his control, and otherwise prevent "any withdrawal, transfer, pledge, encumbrance, assignment, dissipation, concealment, or other disposal of any assets, funds, or other property," including money and

personal property, whether held in Mattera's name or for his direct or indirect beneficial interest. (Id. at 6.)

On September 26, 2012, this Court found, by clear and convincing evidence, that Mattera violated the asset freeze by, inter alia, liquidating assets and transferring the proceeds to his mother, incurring debt in excess of that permitted by the Consent Order, and having his mother make unauthorized expenditures on his behalf. (Findings of Fact and Conclusions of Law on Civil Contempt ("Contempt Order") 7–14, Docket # 107.) Accordingly, the Court held him in contempt of court. (Id. at 21–22.) Mattera was ordered to pay $75,000 to the Court Registry and provide the SEC and the Court, by September 30, 2012, a verified accounting of his assets and related documents. (Id. at 23–24.) The Court warned that if he failed to comply with the terms of the order, his Answer would be stricken. (Id. at 24–25.) The Contempt Order, in relevant part, stated:

> If John Mattera does not file such evidence establishing full compliance with Paragraphs 1, 2, and 3, his Answer in this action, filed on January 27, 2012 (Docket # 64), will be STRICKEN. The foregoing relief is appropriate because other sanctions are not likely to be efficacious, John Mattera's conduct has caused significant delay and prejudiced the SEC's ability to prove its case, and, further, John Mattera has made no significant effort to purge himself of contempt since the SEC's May 22, 2012 application.
> (Id. at 24–25.)

As of July 30, 2013, Mattera had failed to comply with the terms of the September 26, 2012, Contempt Order. (See Willenken Decl. ¶ 12.) There is no evidence that he has complied since then.

The striking of a defendant's pleading is a drastic measure and runs counter to the strong policy in favor of giving every party his day in court. Throughout this litigation,

Mattera's conduct has caused delay.  In the Contempt Order, Mattera was given clear notice that his failure to comply with its terms would result in the striking of his Answer.  Because he has failed to comply with the monetary sanctions of the Contempt Order, a sanction less than the striking of his pleading would not likely be efficacious.  Despite notice and warning from the Court, he has, for ten months, failed to comply with the Contempt Order.  Consequently, the Court hereby strikes Mattera's Answer in this action.

II.     Factual History

The following facts are either undisputed or described in the light most favorable to defendants as the non-movants.  See, e.g., Costello v. City of Burlington, 632 F.3d 41, 45 (2d Cir. 2011).  Because Mattera's Answer has been stricken, the allegations against him in the Complaint are accepted and deemed as true by the Court, but only insofar as consideration of the motion directed towards him.  See Rule 8(b)(6), Fed. R. Civ. P.  Additional facts are derived from the parties' submissions of evidence in connection with the motions and their respective Rule 56.1 statements, but only to the extent not disputed by Howard.

Though Howard has not submitted a sworn statement in opposition to the SEC's motion, the Court will consider the assertions in his Rule 56.1 statement and opposition brief to the extent that they are otherwise admissible.  See Geldzahler v. N.Y. Med. Coll., 746 F. Supp. 2d 618, 620 n.1 (S.D.N.Y. 2010) ("[D]espite [plaintiff] having received the 56.2 Notice, we take into account his status as a pro se litigant and will consider the unsworn statements in his 56.1 Response on the assumption that he would have testified to these statements in his Declaration.").  To the extent that Howard's earlier sworn testimony conflicts with his later unsworn statements in opposition to the motion, the earlier testimony is accepted as true.  Hayes v. New York City Dep't of Corrs., 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an

issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.")

In 2010, Mattera, together with his associate Bradford Van Siclen, formed an entity known as the Praetorian Fund and a number of affiliated LLCs. (Compl. ¶ 27–28.)[1]  Each LLC purported to be an SPV that held (or would soon hold) shares in a single pre-IPO company, such as Facebook, Groupon, or Zynga. (Id.)  In reality, the LLCs held no shares at all. (Id. ¶ 33.)  None of the funds were registered with the SEC. (Willenken Decl. Ex. G ¶ 15.)

Beginning in approximately August, 2010, Mattera and Van Siclen solicited investments in the Praetorian entities through a number of broker-dealers. (Compl. ¶¶ 29–30.)  In order to facilitate sales, Mattera and Van Siclen provided subscription agreements representing that the Fund held shares of pre-IPO companies and that investor funds would be held in an escrow account until a later triggering event. (Id. ¶ 32–33.)  Once investors transferred money into the purported escrow accounts, Mattera had the funds removed and distributed amongst his associates. (See id. ¶¶ 85–87.)

Howard's affiliation with Praetorian began in July or August, 2011, when he, together with representatives of Eastern Institutional Funding ("EIF"), met with Van Siclen at a bar in Manhattan to speak about business opportunities with the Praetorian Fund. (Jacobson Decl. Ex. E, at 11–13.)  Van Siclen described Praetorian to Howard as a fund which held shares of pre-IPO companies which were expected to go public within the next eighteen to twenty-four months. (Id. at 15–16.)  At the meeting, Van Siclen recruited Howard to introduce Praetorian funds to broker-dealers in the New York area. (Id. at 16.)  The dealers would then, in turn, sell the product to their clients. (Id.)  Howard's compensation would be 10% of sales, shared with

---

[1] The allegations of the Complaint are relied upon only as to defendant Mattera whose Answer has been stricken and not as to defendant Howard who has answered and denied many of the material allegations of the Complaint.

the brokers, based on the volume of sales the brokers made. (See id. at 18–19, 30–31.) Once

Howard began working with broker-dealers, Praetorian sent compensation to Howard directly.

(Id. at 133.) Howard then passed a portion of the compensation to the broker-dealers as their

commission. (Id.) On average, Howard kept 2% of the commission. (Id. at 133–34.)

      While affiliated with Praetorian, Howard acted as a liaison between brokers and

Van Siclen. (See id. at 36–40.) When brokers had questions, they would ask Howard, who

would forward the questions to Van Siclen. (See id.) In addition to answering questions,

Howard pointed brokers to Praetorian's website for more information. (Id. at 78–80.) In order

to obtain information about the funds, users were required to register with the website as

accredited investors. (Id. at 78–79.) Only after the registration process was complete did users

gain access to fund information. (Id. at 82.) According to Howard, the process was identical to

that found on other investment websites. (Id. at 28–30, 78–79.)

      Joseph Almazon was one investor that Howard introduced to the Praetorian fund.

(Id. at 65, 75, 85–86.) Howard initially met Almazon through dealings with EIF. (See id. at 65.)

Believing Almazon to be a registered broker-dealer, Howard gave him information about

Praetorian. (See id. at 66–69, 74–75.) Though Howard explicitly told Almazon that the fund

was only open to accredited investors, Almazon, who was not accredited, invested in Praetorian

on his own. (Id. at 81–82; see Pl.'s Rule 56.1 Statement Against Howard ¶¶ 15, 19.) In order to

invest, Almazon signed documentation attesting that he met the requirements of accreditation.

(Jacobson Decl. Ex. G, at 78–79.)

      After investing his own capital, Almazon brought in one other investor, who he

thought was accredited, to the fund. (Jacobson Decl. Ex. G, at 105–06.) Subsequently, Almazon

increased his involvement and, with Van Siclen's approval, began directly soliciting investors on

a larger scale. (See id.) To increase sales, Almazon added an "investment banking" tab on his web site and enlisted the help of interns in his office. (See id. at 106, 122.) Almazon told the interns that they should "feel free" to bring Praetorian to the attention of their friends or family. (Id.) In pursuit of investors, one intern made a posting to LinkedIn advertising access to shares of the pre-IPO companies. (See id. at 106–07; Jacobson Decl. Ex. B ¶ 6.) When Van Siclen learned of the posting, he instructed Almazon to take it down. (Jacobson Decl. Ex. G, at 106–07.) Praetorian did not gain any new investors from the advertisement. (Id. at 107.) Howard had no knowledge of Almazon's actions, or of the LinkedIn posting. (Jacobson Decl. Ex. E, at 87–88; Def. Howard's Rule 56.1 Statement ¶ 18.)

Almazon received compensation through EIF for his dealings with Praetorian. (Def. Howard's Rule 56.1 Statement ¶¶ 12–20.) Because Howard initially introduced Almazon to the fund, he expected to be credited for his role, but did not receive any compensation for Almazon's investments, or those investments that Almazon solicited. (Jacobson Decl. Ex. E, at 84–87.) In a message to Van Siclen, Howard claimed that he introduced both Almazon and EIF to Praetorian and wanted to ensure that he would be paid accordingly. (Id.)

Howard also told his friends, Jared Reynolds and Nicole Stillings, about the Praetorian Fund, who, though interested in investing, and were "obviously doing pretty well," could not meet Praetorian's minimum investment thresholds. (See id. at 88–91.) To facilitate their investment, Howard suggested that they form an LLC to act as an SPV and pool for investors. (Id. at 89–92.) Howard assisted in the creation of the fund and put his friends in direct contact with Praetorian. (Id. at 107–110.) Howard also provided a signed letter attesting that the newly-formed fund was a "verified introducing fund" for Praetorian. (Jacobson Decl. Ex. F.)

Through the LLC, Reynolds and Stillings pooled their friends' investments for the purposes of purchasing Praetorian securities. (Jacobson Decl. Ex. E, at 109–110.) Reynolds and Stillings also kept 2% of the equity in fees. (Id. at 111–12.) Though his friends registered with Praetorian as accredited investors and managed the fund, Howard provided his own access codes to the Praetorian website to at least one investor in the LLC who did not register directly. (Id. at 89, 92–96.)

As noted, the SEC filed claims against Mattera for violations of section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and sections 5 and 17(a) of the Securities Act. (Compl. ¶¶ 93–105, 109–11, 115–18.) The SEC also filed claims against Howard for sales of unregistered securities in violation of section 5 of the Securities Act. (Pl.'s Rule 56.1 Statement Against Howard ¶ 5.)

On February 8, 2012, the United States brought criminal charges against Mattera, including a charge of securities fraud, in violation of section 10(b) of the Exchange Act, and Rule 10b-5, based on his sales of Praetorian securities. United States v. Mattera, No. 12 Cr. 127(RJS) (S.D.N.Y.); (Willenken Decl. Ex. B. ¶¶ 8–18.) The criminal case arose out of the same underlying facts as the instant action. (Compare Compl. with Willenken Decl. Ex. B.) The Indictment alleged that from November 2009 through November 2011, Mattera, in combination with other individuals, offered investors the ability to invest in SPVs which they falsely represented owned shares in pre-IPO companies. (Willenken Decl. Ex. B. ¶ 5.) It further alleged that, based on Mattera's misrepresentations, investors sent more than $11 million into escrow accounts maintained by banks in Florida and that Mattera, instead of maintaining the investors' money in escrow, caused the vast majority of investor funds to be transferred to other entities associated with him. (Id. ¶ 17)

On October 2, 2012, Mattera pled guilty to the criminal charges against him, including the charge of securities fraud under section 10(b) and Rule 10b-5. (Willenken Decl. Ex. D.)

LEGAL STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56, Fed. R. Civ. P. It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of its claim or defense, sufficient to demonstrate that it is entitled to relief as a matter of law. Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)).

A fact is material if it "might affect the outcome of the suit under the governing law," meaning that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, granting summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party. Costello v. City of Burlington, 632 F.3d 41, 45 (2d Cir. 2011); accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–88 (1986). In reviewing a motion for summary judgment, the court may scrutinize the record, and grant or

deny summary judgment as the record warrants.  Rule 56(c)(3), Fed. R. Civ. P.  In the absence of any disputed material fact, summary judgment is appropriate.  Rule 56(a), Fed. R. Civ. P.

"A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory or based on speculation." Major League Baseball Properties, Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008) (citations omitted); see also Anderson, 477 U.S. at 249–50 (summary judgment may be granted if the opposing evidence is "merely colorable" or "not significantly probative") (citations omitted).  An opposing party's facts "must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions." Contemporary Mission, Inc. v. U.S. Postal Serv., 648 F.2d 97, 107 n.14 (2d Cir. 1981) (internal quotation marks and citation omitted).

A pro se party's submissions must be read liberally. This precept is especially important in the summary judgment context, where claims are subject to final adjudication.  See Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).  "However, at some point in a lawsuit even pro se litigants must make clear to the court their claims and the facts that they believe entitle them to specific relief.  The summary judgment stage is an appropriate juncture to identify the real issues in a case," even where a party proceeds pro se.  Salahuddin v. Coughlin, 781 F.2d 24, 29 (2d Cir. 1986).

Local Civil Rule 56.1 of this District requires a summary judgment movant to submit a statement with numbered paragraphs setting forth "the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civil Rule 56.1(a).  "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless

specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local Civil Rule 56.1(c). "Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." Local Civil Rule 56.1(d). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Rule 56(c), Fed. R. Civ. P. "'Therefore, only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.'" Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 264 (2d Cir. 2009) (quoting Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997)).

DISCUSSION

I.     <u>Howard Had Adequate Notice and Time to Respond.</u>

Howard contends that he was never provided with a notice of motion, only the supporting documentation. This assertion is unsupported by the record. Though the initial notice was returned by the postal service as undeliverable, notice was later effectuated through e-mail service. (Docket # 159; Def.'s Mem. of Law in Supp. of Def.'s Opp'n to Pl.'s Mot. for Summ. J. Ex. 3.) Included in the e-mail service was the Local Rule 56.2 "Notice to Pro Se Litigant Who Opposes a Summary Judgment Motion," informing Howard of what was required of him as a pro se litigant. (Def.'s Mem. of Law in Supp. of Def.'s Opp'n to Pl.'s Mot. for Summ. J. Ex. 3.) Due to the delay in service, the SEC requested an extension of time for Howard's response. (Docket # 159.) In response to the SEC's request, the Court granted a three week extension of time for Howard to respond to the motion. (Id.) Thus, he had ample time to prepare a response and provide supporting documentation.

II.     The SEC's Motion for Summary Judgment Is Granted with Respect to the
        Claims against Mattera.

With respect to the claims against Mattera, the SEC argues that Mattera's guilty

plea in his criminal action requires a finding of liability in this civil action through the doctrine

of collateral estoppel.  "Under collateral estoppel, once an issue is actually and necessarily

determined by a court of competent jurisdiction, that determination is conclusive in subsequent

suits based on a different cause of action involving a party to the prior litigation."  Montana v.

United States, 440 U.S. 147, 153 (1979).

        a.     Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

The Supreme Court has afforded district courts "broad discretion" in determining

whether to deny collateral estoppel, although "the general rule should be that in cases where a

plaintiff could easily have joined in the earlier action or where . . . the application of offensive

estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive

collateral estoppel."  Parklane Hosiery Co. v. Shore, 439 U.S. 322, 331 (1979).

        In a civil case, it is appropriate to estop a party from relitigating issues actually and

necessarily decided as part of a prior criminal judgment and conviction, in part because "[t]he

government bears a higher burden of proof in the criminal than in the civil context."  Gelb v. Royal

Globe Ins. Co., 798 F.2d 38, 43 (2d Cir. 1986) (citing United States v. Podell, 572 F.2d 31, 35 (2d

Cir. 1978)), cert. denied, 480 U.S. 948 (1987).  "Perhaps the most attractive cases that have

extended issue preclusion from criminal convictions to civil actions involve claims by the

government for civil remedies based on the same transaction that gave rise to the conviction."  18B

Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 4474

(2d ed.).  For estoppel purposes, there is no difference between a conviction obtained by a plea, or

by a guilty verdict.  Podell, 572 F.2d at 35.  Federal criminal convictions have a collateral estoppel

effect in federal civil actions under a four-part test:

> (1) the issues in both proceedings must be identical, (2) the issue in the prior
> proceeding must have been actually litigated and actually decided, (3) there must
> have been a full and fair opportunity for litigation in the prior proceeding, and (4)
> the issue previously litigated must have been necessary to support a valid and
> final judgment on the merits.
> Gelb, 798 F.2d at 44.

Under prong two of Gelb, Mattera's plea of guilty to the Court on the Indictment in

United States v. Mattera, No. 12 Cr. 127(RJS) (S.D.N.Y.), actually litigated and decided the facts

necessary to reach a verdict on the criminal securities fraud claims as they pertained to Mattera's

misrepresentations about the Praetorian securities.  Similarly, under prong three, the record in the

criminal action, of which the Court take judicial notice, reveals that Mattera was afforded "a full

and fair opportunity for the litigation in the prior proceeding."  There is no evidence that Mattera

was deprived of any procedural or constitutional safeguards in the criminal action; these

proceedings are entitled to a presumption of correctness.  See id.

Violations of section 10(b) of the Exchange Act may lead to both a civil

enforcement action, brought by the SEC, and a criminal enforcement action, brought by the United

States government.  See 15 U.S.C. § 78u(d).  In the criminal action, to establish a violation under

section 10(b) and Rule 10b-5, the government was required to show "that in connection with the

purchase or sale of a security the defendant, acting with scienter, made a material

misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent

device."  SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996).  Because both the

civil and criminal actions stem from the same statutory provision, the elements the SEC must

allege in the instant action are the same as those alleged by the government in the criminal action,

the only difference being the burden of proof necessary to establish liability.  See 15 U.S.C.

§ 78(u)(d); Gelb, 798 F.2d 38 at 43. Therefore, the Court looks to the facts set forth in the Indictment and in the civil Complaint as they pertain to the issuance and sales of Praetorian securities for the purpose of evaluating the first and fourth prongs of Gelb.

In Count 2, the Indictment alleged that, in violation of section 10(b) and Rule 10b-5, Mattera "willfully and knowingly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, did use and employ, in connection with the purchase and sale of securities, to wit, interests in [Praetorian funds], manipulative and deceptive devices and contrivances, . . . ." (Willenken Decl. Ex. B ¶ 14.) From November 2009 through November 2011, Mattera, in combination with other individuals, offered investors the ability to invest in SPVs which they falsely represented owned shares in pre-IPO companies. (Id. ¶ 5.) Based on Mattera's misrepresentations, investors sent more than $11 million into escrow accounts maintained by banks in Florida. (Id. ¶ 7.) Instead of maintaining the investors' money in escrow, Mattera caused the vast majority of investor funds to be transferred to other entities associated with him. (Id.)

The civil Complaint sets forth claims under section 10(b) and Rule 10b-5 arising out of the same transactions. (Compl. ¶¶ 98–102.) It alleges that Mattera, together with associates, solicited investments in LLCs purporting to be SPVs that held (or would soon hold) shares in a single pre-IPO company, such as Facebook, Groupon, or Zynga. (Id. ¶¶ 27–30.) In reality, the LLCs held no shares at all. (Id. ¶ 33.) In order to facilitate sales, Mattera provided subscription agreements representing that Praetorian held shares of pre-IPO companies and that investor funds would be held in an escrow account until a later triggering event. (Id. ¶ 32–33.) Once investors transferred money into the purported escrow accounts, Mattera had the funds removed and distributed amongst his associates. (See id. ¶¶ 85–87.) Reduced to its essentials,

Mattera's conviction pursuant to section 10(b) and Rule 10b-5 actually and necessarily decided that he was civilly liable under section 10(b) and Rule 10b-5 of making false representations concerning SPVs that purportedly held shares of pre-IPO companies.

   For the purposes of this motion, the Court concludes that Mattera's prior conviction estops him from relitigating the same facts as they pertain to civil claims under section 10(b) and Rule 10b-5. Mattera's guilty plea in the parallel criminal action actually and necessarily decided that Mattera, "acting with scienter, made a false material representation" causing injury, Caiola v. Citibank, N.A., N.Y., 295 F.3d 312, 321 (2d Cir. 2002) (internal quotations and citations omitted), and that, as Gelb requires, the issues in that proceeding were identical to those here. The SEC will be granted summary judgment in its favor on its section 10b and Rule 10b-5 claims arising out of Mattera's misrepresentations about the Praetorian funds.

   b. Section 17(a) of the Securities Act

   "Section 17(a) of the Securities Act is a general prohibition against fraud in the offer or sale of securities, using the mails or the instruments of interstate commerce." SEC v. McCaskey, No. 98 CIV. 6153, 2001 WL 1029053, at *4 (S.D.N.Y. Sept. 6, 2011). The elements constituting a prima facie showing of a section 17(a) violation are "essentially the same" as the elements of a violation of section 10(b) of the Exchange Act. SEC v. Monarch Funding Grp., 192 F.3d 295, 308 (2d Cir. 1999). The difference between the two sections is that section 17(a) applies only to sellers of securities, whereas section 10(b) applies to both buyers and sellers. Aaron v. SEC, 446 U.S. 680, 687–88 (1980). Therefore, if a party is liable under section 17(a), it is necessarily liable under section 10(b) as well. See McCaskey, 2011 WL 1029053, at *4. Conversely, if a seller is liable under section 10(b), it is necessarily liable under section 17(a).

For the purposes of this motion, the Court concludes that Mattera's liability under section 10(b) estops him from relitigating the same facts as they pertain to civil claims under section 17(a).  Because Mattera was a seller of Praetorian securities, his violations of section 10(b) actually and necessarily establish that he knowingly engaged in the fraudulent sale of securities, in violation of section 17(a).  The SEC will be granted summary judgment in its favor on its section 17(a) claims arising out of Mattera's misrepresentations about the Praetorian funds.

### c.  Section 5 of the Securities Act

Unlike the other claims against Mattera, claims pursuant to section 5 of the Securities Act were not present in the Indictment in the criminal prosecution.  Under section 5, all non-exempt securities offered for sale to the public must be registered with the SEC prior to the offer or sale of such securities.  See 15 U.S.C. § 77e; see also SEC v. Cavanagh (Cavanagh III), 445 F.3d 105, 111 (2d Cir. 2006).  To state a claim under section 5, the SEC must show "(1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale." Cavanagh III, 445 F.3d at 111 n.13 (internal quotation marks and citation omitted).  Scienter is not an element of a section 5 violation.  See SEC v. Universal Express, Inc., 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007); SEC v. Softpoint, Inc., 958 F. Supp. 846, 859–60 (S.D.N.Y.1997), aff'd, 159 F.3d 1348 (2d Cir. 1998) (citing SEC v. Universal Major Indus. Corp., 546 F.2d 1044, 1047 (2d Cir. 1976)).  A defendant may rebut the SEC's prima facie case for a section 5 violation by proving the applicability of an exemption from registration.  See Cavanagh III, 445 F.3d at 111 n.13 (citation omitted); Universal Express, Inc., 475 F. Supp. 2d at 422.

Here, the SEC has established the elements of a section 5 violation. First, the SEC has shown that the shares of Praetorian Mattera sold were not registered. (Willenken Decl. Ex. G ¶ 15.) Second, the securities were offered for sale. (Compl. ¶¶ 29–30.) Finally, because Matera solicited investments through e-mail, interstate communication was used in connection with the offer or sale. (Compl. ¶¶ 30, 43.) Therefore, the SEC has made a prima facie showing of Mattera's liability.

Once the SEC has made its showing, the burden falls to Mattera to show that the offering qualified for an exemption from registration. Because Mattera has not submitted a response to the SEC's motion, despite having had a full and fair opportunity to do so, he has not met his burden. Therefore, the SEC's motion for summary judgment with respect to the claims relating to Mattera's violation of section 5 of the Securities Act will be granted.

III.    The SEC's Motion for Summary Judgment with Regards to the Claims against Howard Pursuant to Section 5 Is Granted.

The SEC asserts that, because Howard assisted in the sale of unregistered securities, he violated section 5 of the Securities Act. Section 4(1) of the Securities Act provides that the registration requirements of section 5 do not apply to "transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(a)(1). As such, section 4(1) provides an exemption for transactions, not individuals. Liability for violations of section 5, therefore, can extend beyond issuers, underwriters and dealers, to all necessary participants in the sale of unregistered stock by someone who is an issuer, underwriter or dealer. See Universal Express, Inc. 475 F. Supp. 2d at 422 ("Liability for violations of Section 5 extends to those who have 'engaged in steps necessary to the distribution of [unregistered] security issues." (quoting SEC v. Chinese Consol. Benev. Ass'n. Inc., 120 F.2d 738, 741 (2d Cir. 1941) (alteration in original));

see also SEC v. Cavanagh (Cavanagh I), 1 F. Supp. 2d 337, 372 (S.D.N.Y. 1998), aff'd, 155 F.3d 129 (2d Cir. 1998). "The 'necessary participant test . . . essentially asks whether, but for the defendant's participation, the sale transaction would not have taken place'—in other words, whether the defendants' acts were a 'substantial factor in the sale transactions.'" Universal Express, Inc., 475 F. Supp. 2d at 422 (alteration in original) (quoting SEC v. Murphy, 626 F.2d 633, 651–52 (9th Cir. 1980)).

Howard does not dispute that the Praetorian offerings were unregistered, offered for sale, or that interstate communication was used in the sales.  The SEC alleges that Howard was a necessary participant and substantial factor in the unregistered offering by virtue of the following conduct:  (1) introducing broker-dealers to Praetorian; (2) acting as a liaison between the broker-dealers and Praetorian; (3) assisting his friends in the creation of an LLC with the purpose of purchasing Praetorian funds.

Howard also does not dispute that he played a role in the sale of the Praetorian securities, that the sales at issue would not have taken place but for Howard's introductions, and that he communicated with broker-dealers regarding what actions they should take with clients. (See Def. Howard's Rule 56.1 Statement ¶¶ 8–10.)  Though Howard was not the party selling securities, he was actively involved in the process and compensated for his role.  (Jacobson Decl. Ex. E, at 133–34.)  As such, there is no material dispute that Howard was a substantial factor in the sale of unregistered securities.  Therefore, the SEC has made a prima facie showing of Howard's liability.

Once the SEC has made its showing, the burden falls to Howard to show that the offering qualified for an exemption from registration.  Though Howard does not explicitly state which exemption should apply to his actions in facilitating the sale of unregistered securities, the

documents he submitted indicate that he is arguing for an exemption under the private placement

exemption of Rule 506 in that he only solicited investments, through broker-dealers, of

accredited investors.  17 C.F.R. § 230.506; (See Def. Howard's Rule 56.1 Statement ¶¶ 4, 15.)

Howard argues that Praetorian purported to certify its investors and that he relied, in good faith,

on the representations of both Praetorian and the investors themselves.  The SEC claims that

Almazon's general solicitations of Praetorian funds served to taint the entire offering and, as

such, no exemptions are available.  Howard asserts that Almazon's solicitations should be viewed

as separate from Howard because EIF was the entity that collected commissions on Almazon's

behalf.

 Under Rule 506, offerings are exempt from registration if there are no more than

thirty-five unaccredited purchasers for the offering and the offering conforms to the general

requirements laid out by the SEC.  17 C.F.R. §§ 230.502, 230.506.  A purchaser is considered

"accredited" if the issuer, or a person acting on the issuer's behalf, reasonably believes that the

purchaser meets the SEC's requirements.  17 C.F.R. § 230.501(a).  If it is later shown that a

purchaser did not meet the requirements of accreditation, the exemption will not be lost if the

issuer can show that it acted in good faith in attempting to comply with the requirements and the

failure to comply was not significant "with respect to the offering as a whole."  17 C.F.R.

§ 230.508.

 The Rule outright prohibits general solicitations for sales of unregistered

securities.  See 17 C.F.R. §§ 230.502(c), 230.508.  General solicitations include, but are not

limited to, "[a]ny advertisement, article, notice or other communication published in any

newspaper, magazine, or similar media or broadcast over television or radio."  17 C.F.R.

§ 230.502(c).  As a general rule, an offering tends to become public "when the promoters begin

to bring in a diverse group of uninformed friends, neighbors and associates." <u>Nonpublic</u>

<u>Offering Exemption</u>, 1933 Act Release No. 33-4552, 27 Fed. Reg. 11316 (Nov. 6, 1962). If a

general solicitation has been deemed to have taken place, then no exemption may be claimed.

<u>See</u> <u>id.</u>; <u>see also</u> <u>SEC v. Opulentica, LLC</u>, 479 F. Supp. 2d 319, 328 (S.D.N.Y. 2007) (finding no

exemption available because defendants engaged in general solicitation in newspapers and web

pages).

      Any solicitation by an authorized agent or representative of an issuer will serve to

deprive an offering of any exemptions claimed by the issuer. <u>See</u> 17 C.F.R. §§ 230.502(c),

230.508 (stating that any general solicitation is deemed significant with respect to the offering as

a whole); <u>Nonpublic Offering Exemption</u> ("If the investment banker places the securities with

discretionary accounts and other customers without regard to the ability of such customers to

meet the tests implicit [for accredited investors], the exemption may be lost."). Though the

regulations are silent as to the consequences of unauthorized or accidental solicitations, at least

one court has taken the view that if the consequences of the solicitation were <u>de minimis</u>, and the

issuer took action to correct the error, the issuer may still claim an exemption. <u>See</u> <u>SEC v.</u>

<u>Dunfee</u>, Fed. Sec. L. Rep. (CCH) ¶ 91,970, 1966 U.S. Dist. LEXIS 10105, at *3 (W.D. Mo.

1966).

      The SEC asserts that Almazon engaged in general solicitation for sales of

Praetorian funds because he added an "investment banking" tab to his website and because an

intern posted an advertisement to LinkedIn promoting the securities. Because the record is silent

as to what Almazon posted on the "investment banking" tab on his website, the Court cannot

conclude that the tab constituted a general solicitation. (<u>See</u> Jacobson Decl. Ex. G, at 121.)

Similarly, because the LinkedIn posting was made without Almazon's authorization, he told the

intern to take the promotional materials down shortly after they were posted, and Praetorian

gained no new investors as a consequence, it appears that the advertisement was an error with <u>de

minimis</u> consequences.  (<u>See</u> <u>id.</u> at 106–07.)  If this were the only evidence concerning general

solicitation, the Court would be inclined to deny summary judgment and set the matter for trial at

which a more fulsome record could be developed.

However, Almazon also told interns that they could "feel free" to bring the

Praetorian Fund to the attention of friends and family.  (<u>Id.</u> at 106.)  Because Almazon had no

reason to believe that interns' acquaintances and relatives would be sophisticated investors who

would qualify as accredited investors, his actions do qualify as a general solicitation.  Therefore,

Almazon's actions deprived sales of Praetorian securities from a Rule 506 exemption, if the sales

at issue were part of the same "offering."

The term "offering" is not defined in the Securities Act.  17 C.F.R. § 230.502(a).

"[T]he determination as to whether separate sales of securities are part of the same offering (<u>i.e.,</u>

are considered <u>integrated</u>) depends on the particular facts and circumstances."  <u>Id.</u> (emphasis in

original).  "A person may not separate parts of a series of related transactions, the sum total of

which is really one offering, and claim that a particular part is a nonpublic transaction."

<u>Nonpublic Offering Exemption</u>.  Whether two separate sales of securities are integrated is a

question of fact.  <u>See</u> <u>Brown v. Earthboard Sports USA, Inc.</u>, 481 F.3d 901, 914 (6th Cir. 2007).

The SEC standard, which courts have applied, examines five factors to determine

whether separate sales should be integrated into one offering:  (1) whether the different sales are

part of a single plan of financing; (2) whether the sales involve issuance of the same class of

securities; (3) whether the offerings were made at or about the same time; (4) whether the same

type of consideration is being received; and (5) whether the sales are made for the same general purpose.  17 C.F.R. § 230.502(a); Cavanagh III, 445 F.3d at 112 n.17.

The inquiry is made from the perspective of the issuer of the securities.  See Murphy, 626 F.2d at 645–46 (finding offerings to be integrated despite "difficulty" in determining the issuer); Cavanagh I, 1 F. Supp. 2d at 365 (finding that two events were "integrated in the minds of their architects").  Neither the SEC, nor any court, has provided guidance as to how to weigh the factors, though, in general, the first and fifth factors are often given greater weight.  Id. at 364 (citations omitted).

Mattera and Van Siclen, as the creators of the Praetorian funds, are the issuers.  With respect to them, all five factors weigh heavily in favor of finding all sales of Praetorian funds to be integrated.  First, all sales were part of a larger plan involving the sale of Praetorian equities.  Second, there is no evidence to suggest any difference between sales that Almazon facilitated and sales other broker-dealers made; all sales were for the same shares of Praetorian.  Third, Almazon made his sales contemporaneously with Howard's solicitations of broker-dealers.  Fourth, it appears that all sales were made in exchange for cash.  Finally, both Howard and Almazon were working towards a common goal—selling Praetorian investments.

Because they involved the same offering, no reasonable fact-finder could find that Howard's sales of securities were independent from Almazon's actions.  As such, no exemption is available for any sales that Howard facilitated making him liable under section 5 of the Securities Act.  Therefore, the SEC's motion for summary judgment on the issue of Howard's liability will be granted.

IV.     Howard Is Ordered to Pay $34,575 Plus Prejudgment Interest in
        Disgorgement.

Disgorgement of illicit profits is a proper equitable remedy for violations of the

securities laws. See SEC v. Tome, 833 F.2d 1086, 1096 (2d Cir. 1987) (disgorgement "is a

method of forcing a defendant to give up the amount by which he was unjustly enriched."

(internal quotation marks and citation omitted)).  "The remedy consists of factfinding by a

district court to determine the amount of money acquired through wrongdoing . . . ."  Cavanagh

III, 445 F.3d at 116.  Consequently, a district court has "broad discretion not only in determining

whether or not to order disgorgement but also in calculating the amount to be disgorged."  First

Jersey Secs., Inc., 101 F.3d at 1474–75.

"The primary purpose of disgorgement orders is to deter violations of the

securities laws by depriving violators of their ill-gotten gains."  SEC v. Fischbach Corp., 133

F.3d 170, 175 (2d Cir. 1997).  Because the distribution of disgorged profits to fraud victims is a

secondary goal, "the size of a disgorgement order 'need not be tied to the losses suffered by

defrauded investors.'"  Official Comm. Of Unsecured Creditors of WorldCom, Inc. v. SEC, 467

F.3d 73, 81 (2d Cir. 2006) (quoting Fischbach Corp., 133 F.3d at 175–76).  In situations where

the disgorgement amount cannot be accurately measured, it must "be a reasonable approximation

of profits causally connected to the violation."  SEC v. Warde, 151 F.3d 42, 50 (2d Cir. 1998)

(quoting SEC v. Patel, 61 F.3d 137, 139 (2d Cir. 1995)).  Any risk of uncertainty falls on the

party who created the uncertainty.  Id. (citing Patel, 61 F.3d at 140).

Once the SEC has made a reasonable showing of defendants' illicit profits, the

burden shifts to the defendants to show that the disgorgement figure is not a reasonable

approximation.  Opulentica, LLC, 479 F. Supp. 2d at 330.  Ultimately, the SEC bears the burden

of persuasion that its disgorgement figure reasonably approximates the amount of unjust enrichment.  See id.

The SEC seeks disgorgement in the amount of $141,655, which Howard received in commissions from his role in the Praetorian offerings.  The SEC bases this figure upon Howard's verified accounting.  (Jacobson Decl. Ex. C.)  This accounting is also supported by wire transfer documents from Praetorian to Howard.  (See Jacobson Decl. Ex. D.)  Howard does not dispute that he received $141,655, but also asserts that he paid out $107,080 to various broker-dealers, which he also attested to in the accounting.  (Jacobson Decl. Ex. C.)  This Court concludes that a more reasonable approximation of his gain is the amount retained in his accounts, $34,575.

The $107,080 that Howard paid is best characterized as a transaction cost incurred in the course of his dealings.  Such costs are typically deductible from a calculation of profits to be disgorged.  Cf. Hermann v. Steinberg, 812 F.2d 63, 66 (2d Cir. 1987) ("Non-incidental expenses incurred in purchasing section 16(b) stock are not deductible from short swing profits.").  "To require disgorgement of all fees and commissions without permitting a reduction for associate expenses and costs constitutes a penalty assessment and goes beyond the restitutionary purpose of the disgorgement doctrine."  Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc., 734 F. Supp. 1071, 1077 (S.D.N.Y. 1990).

The SEC asserts that the verified accounting should not be relied upon in its entirety because the payments to brokers, unlike the payments received by Howard, are not corroborated by other parts of the record.  The SEC argues that they should not be given any credence.  The verified accounting is, in some part, corroborated.  In addition to the statements in

his verified accounting, Howard testified that he shared commissions with broker-dealers. (Jacobson Decl. Ex. E, at 18–19, 30–31.)  The figures Howard provided are consistent with his testimony that broker-dealers took, on average, 80% of the commissions.  (See id. at 133–34.) Furthermore, the verified accounting shows payments from Praetorian which total $14,155 more than the payments documented by the wire transfers and are not corroborated anywhere else, but are relied upon by the SEC.  (Compare Jacobson Decl. Ex. C with Jacobson Decl. Ex. D.) Because the verified accounting, made under penalty of perjury, is consistent with both the wire transfers and Howard's prior testimony, the Court credits Howard with the $107,080 that he paid to broker-dealers.  Therefore, the appropriate amount to be disgorged is $34,575, representing the amount Praetorian paid Howard, $141,655, less the amount he paid out to broker-dealers, $107,080.

"The decision whether to grant prejudgment interest and the rate used if such interest is granted are matters confided to the district court's broad discretion . . . .  In deciding whether an award of prejudgment interest is warranted, a court should consider (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court. . . .  When the SEC itself orders disgorgement . . . the interest rate it imposes is generally the IRS underpayment rate, . . . [which] reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its [illegal activity]." First Jersey Secs., Inc., 101 F.3d at 1476 (citations omitted).  These factors all weigh in favor of granting prejudgment interest at the IRS underpayment rate.

Therefore, Howard will be ordered to disgorge $34,575, plus prejudgment interest thereon.  Prejudgment interest will be paid at the IRS underpayment rate.

Because disgorgement is an equitable remedy akin to unjust enrichment, an award of prejudgment interest is meant to deprive a defendant of the benefit he received for the use of his illegal profits.  See SEC v. Razmilovic, No. 12-0357, slip op. at 33 (2d Cir. Nov. 26, 2013).  Where, as here, the defendant has had some of his assets frozen as part of an enforcement action, "an award of prejudgment interest relating to those funds would be inappropriate with respect to the period covered by the freeze order, for the defendant has already, for that period, been denied the use of those assets."  Id.  Consequently, the SEC will be required to determine whether to apply Howard's frozen assets against the judgment, or to seek satisfaction from other sources.  For any portion of the principal satisfied from the frozen assets, a new computation of the prejudgment interest amount, with the principal reduced by the portion satisfied, will be necessary.  See id. at 36.

> V.    The SEC's Motion for Summary Judgment with Respect to Civil Money
>        Penalties against Howard Is Denied.

The Court may order civil monetary penalties for the Securities Act violations at issue.  15 U.S.C. § 77t(d)(2); see SEC v. Palmisano, 135 F.3d 860, 865 (2d Cir. 1998).  There are three separate "tiers" of potential penalties, which increase depending upon the seriousness of the violation.  15 U.S.C. § 77t(d)(2); 17 C.F.R. § 201.1005.  In the first tier, for non-scienter violations, "the amount of the penalty shall not exceed (i) the greater of $7,500 for a natural person or $75,000 for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation."  15 U.S.C. § 77t(d)(2); 17 C.F.R. § 201.1005.  In the second tier, where the violation "involved fraud, deceit, manipulation, or deliberate or reckless

disregard of a regulatory requirement," the penalty "shall not exceed the greater of (i) $75,000 for a natural person or $375,000 for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation." 15 U.S.C. § 77t(d)(2); 17 C.F.R. § 201.1005. And in the third tier, where the violation (I) "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and (II) "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons," the penalty "shall not exceed the greater or (i) $150,000 for a natural person or $725,000 for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation." 15 U.S.C. § 77t(d)(2); 17 C.F.R. § 201.1005.

The SEC seeks third-tier penalties against Howard. There is no dispute that Howard's conduct in facilitating the sale of unregistered securities created substantial losses or the risk of substantial losses to other persons. However, the SEC has not, on this motion, demonstrated that Howard acted with "reckless disregard of a regulatory requirement."

Though scienter is not an element of a section 5 violation, a finding of recklessness on the part of a defendant is necessary to justify second or third-tier penalties for violations. See 15 U.S.C. § 77t(d); SEC v. Kern, 425 F.3d 143, 153 (2d Cir. 2005) ("Assuming without deciding that scienter is necessary to an imposition of Tier III penalties . . . ."). Once the tier has been determined, the amount of the penalty is left to the discretion of the Court. Kern, 425 F.3d at 153. The question of scienter is typically one for the fact-finder, even when liability has already been established. See SEC v. Elliott, No. 09 Civ. 7594(RJH), 2011 WL 3586454, at *15–16 (S.D.N.Y. Aug. 11, 2011) (citing SEC v. M & A West, Inc., 538 F.3d 1043, 1054–55 (9th Cir. 2008)). In the summary judgment context, when a violation has been established, but scienter has not been sufficiently established, an evidentiary hearing may be appropriate. Id. If

there are no other outstanding issues of liability, a court may act as a fact-finder on the issue. See Tull v. United States, 481 U.S. 412, 427 (1987) ("We therefore hold that a determination of a civil penalty is not an essential function of a jury trial, and that the Seventh Amendment does not require a jury trial for that purpose in a civil action.").

Reckless conduct is "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant had to have been aware of it." Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (quotation omitted). In cases concerning the sale of unregistered securities, courts have found reckless disregard for regulatory requirements when the defendant was either a licensed broker, or in a position to know of the existence of regulatory requirements. See, e.g., SEC v. Elliott, No. 09 Civ. 7594(KBF), 2012 WL 2161647, at *4, *8 (S.D.N.Y. June 12, 2012) (finding reckless disregard when the defendant passed a Series 7 exam and had substantial expertise in the industry); Universal Express, Inc., 646 F. Supp. 2d at 559, 568–69 (finding reckless disregard when the defendants were a securities trader and an investment advisor).

Throughout Howard's involvement with Praetorian, he attested that he genuinely believed that the investments were real and was following proper protocol with regards to the investments. The SEC does not dispute Howard's good faith or his belief. (See Pl.'s Reply Mem. of Law in Supp. of its Mot. for Summ. J. 8.) Rather, the SEC asserts that Howard took no reasonable steps to ensure that the Praetorian offerings complied with section 5. Based on the summary judgment record, a reasonable fact-finder could find that Howard did attempt to conform to the requirements of the private offering exemption of Rule 506. On multiple occasions, Howard made clear to those with whom he was dealing that Praetorian funds were

only available to accredited investors.  (Jacobson Decl. Ex. E, at 78–79, 81–82.)  Furthermore, before getting information regarding the offerings, prospective investors were required to assert that they met the accreditation requirements set forth by the SEC.  (Id. at 78–79.)

The SEC asserts that Howard was unreasonable in his reliance on Praetorian's processes.  Unreasonable reliance, though sufficient for a showing of negligence, is not sufficient to show a party acted recklessly.  Negligence alone is not sufficient to warrant the imposition of a third-tier penalty on a defendant.  See  SEC v. O'Meally, No. 06 Civ. 6483(LTS)(RLE), 2013 WL 878631, at *6–7 (S.D.N.Y. Mar. 11, 2013).

Because a reasonable fact-finder could find that Howard did not act with the requisite scienter warranting third-tier money damages, the SEC's motion for summary judgment as to the issue of civil money damages is denied.

> VI.    Mattera Is Permanently Enjoined from Further Violations of Section 10(b) of the Exchange Act, Sections 5 and 17(a) of the Securities Act, and the Issuance, Offer, or Sale of Any Security, Unless Listed on a National Securities Exchange for His Own Personal Account.

The Exchange Act permits the SEC to seek a permanent injunction against "any person [who] is engaged or is about to engage in acts or practices constituting a violation" of a rule or regulation.  15 U.S.C. § 78u(d)(1).  To obtain such relief, the SEC must show that (1) violations of the securities laws have occurred, and (2) a substantial likelihood exists that violations will occur in the future.  See SEC v. Cavanagh (Cavanagh II), 155 F.3d 129, 135 (2d Cir. 1998); SEC v. Commonwealth Chem. Secs., Inc., 574 F.2d 90, 99 (2d Cir. 1978).

To determine whether a permanent injunction is appropriate, courts look at the following factors: "[1] the fact that the defendant has been found liable for illegal conduct; [2] the degree of scienter involved; [3] whether the infraction is an 'isolated occurrence;' [4] whether defendant continues to maintain that his past conduct was blameless; and [5] whether,

because of his professional occupation, the defendant might be in a position where future violations could be anticipated." <u>Cavanagh II</u>, 155 F.3d at 135 (internal quotation marks and citation omitted).

Considering the totality of the circumstances and all of the relevant factors, the Court believes injunctive relief against Mattera is required. First, the record reflects that Mattera violated sections 5 and 17(a) of the Securities Act, as well as section 10(b) of the Exchange Act and Rule 10b-5 thereunder. Second, the record is sufficient to show that Mattera, as the architect of the fraudulent scheme, acted with a high degree of scienter. Third, it may not be said that Mattera's actions constitute an "isolated occurrence." On at least one other occasion unrelated to this action, the SEC has accused Mattera of violations of both section 5 of the Securities Act and section 10(b) of the Exchange Act. <u>SEC v. Prime Time Grp.</u>, No. 09-80952-CIV-COHN/SELTZER (S.D. Fla.); (Pl's Rule 56.1 Statement Against Mattera ¶ 21.) Fourth, Mattera, by pleading guilty in the parallel criminal action, has accepted responsibility for his actions. Finally, because Mattera was the architect of the fraud, he remains in a position where future violations of securities regulations may occur. Therefore, it is substantially likely that, unless enjoined by the Court, Mattera will engage in further acts and practices that violate securities regulations.

While Mattera was selling interests in the Praetorian securities, he was already subject to a permanent injunction against future violations of section 5 of the Securities Act and section 10(b) of the Exchange Act arising out of a different set of facts. <u>See</u> Final Judgment of Permanent Injunction and Other Relief as to Defendant John A. Mattera at 2–4, <u>SEC v. Prime Time Grp.</u>, No. 09-80952-CIV-COHN/SELTZER (S.D. Fla. Aug. 9, 2010). Given that the injunction from the Southern District of Florida became effective at the start of August, 2010,

and Mattera began soliciting sales in Praetorian funds at the same time, it appears that Mattera ignored the injunction in its entirety.  See id. (Compl. ¶¶ 29.)

Because Mattera has already been enjoined by one federal court, a stricter injunction is warranted.  Thus, Mattera is hereby permanently enjoined from, directly or indirectly, participating in the issuance, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities listed on a national securities exchange for his own personal account.

VII.   The SEC's Request for a Permanent Injunction against Howard Is Denied.

The instant action is not Howard's first encounter with the SEC.  On March 21, 2011, the SEC sued Howard for violations of securities regulations unrelated to this action in the Central District of California.  See Final Judgment Against David E. Howard II, Flatiron Sys., LLC, and Flatiron Capital Partners, LLC 2–5, SEC v. Spyglass Equity Sys., Inc., No. 2:11-cv-02371-JAK-MAN (C.D. Cal. Apr. 5, 2012).  In the California action, the SEC alleged that Howard "engaged in fraud in connection with the offer or sale of securities" in violation of section 17(a) of the Securities Act and section 10(b) of the Exchange Act, and that Howard "engaged in the unregistered offer and sale of securities" in violation of section 5 of the Securities Act.  Id. at 4–5.  Howard failed to answer the complaint and, on April 5, 2012, while the present action was pending, the California court entered a default judgment against him.  Id. at 1.  The judgment included a permanent injunction against future violations of section 5 of the Securities Act.  Id. at 11.

Because Howard has already been enjoined from future securities violations by one federal court during the pendency of this action, an additional injunction against Howard

would be unnecessarily duplicative.  Therefore, the SEC's request for a permanent injunction is denied as moot.

CONCLUSION

For the foregoing reasons, the SEC's motions for summary judgment are GRANTED with respect the claims against Mattera and Howard for violations of section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and sections 5 and 17(a) of the Securities Act, and DENIED with respect to the issue of civil money penalties against Howard.  Howard is ordered to disgorge $34,575, plus prejudgment interest thereon.  Prejudgment interest shall be paid at the IRS underpayment rate.  Mattera is permanently enjoined from, directly or indirectly, participating in the issuance, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities listed on a national securities exchange for his own personal account.

Counsel for the SEC is directed to supply defendants Howard and Mattera with copies of all unreported decisions cited herein.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
          December 6, 2013